BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
NATHAN J. LICHVARCIK
Assistant United States Attorney
Nathan.J.Lichvarcik@usdoj.gov
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401-2708
Telephone:    (541) 465-6771
Facsimile:    (541) 465-6917
Attorneys for the United States

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 6:16-mj-00056-JR |
| v. | **GOVERNMENT'S OPPOSITION TO MOTION FOR RELEASE** |
| MICHAEL RAY EMRY, | |
| Defendant. | |

The United States of America, by and through Billy J. Williams, United States Attorney for the District of Oregon, and Nathan J. Lichvarcik, Assistant United States Attorney, hereby submits this opposition to the motion for release filed by defendant Michael Emry, and asks that Defendant remain detained.

### I.    FACTUAL BACKGROUND

The factual background is set forth in detail in the affidavits for the complaint and search warrant, and those facts are hereby incorporated by reference.

## II. PROCEDURAL BACKGROUND

After being charged by criminal complaint, on May 24, 2016, the Court held a detention hearing, heard arguments from both parties, carefully analyzed the detention factors as they applied to Defendant's case, and concluded there are no conditions that will reasonably assure the safety of the community.

Less than two months later, Defendant has now renewed his request for release, proposing that he be allowed to work as a welder and fabricator while living in a trailer in Crescent, Oregon. At bottom, there has not been a substantial change in circumstances that should cause the Court to feel any more comfortable about Defendant's pretrial release.

## III. APPLICABLE LAW

### A. Rules of Evidence Do Not Apply at a Detention Hearing

The Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F.Supp.2d 925, 925 26 (N.D. Cal. 2007).

### B. Standards

Under the Bail Reform Act, 18 U.S.C. § 3142, *et seq.*, which governs the detention of a defendant pending trial, the Court shall order a defendant detained if, after a hearing, it finds that "no condition or combination of conditions will

reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a flight risk or a danger to the community. It is not necessary to prove both. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); *United States v. Kouyoumdijan*, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). The United States bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need only be proved by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *Winsor*, 785 F.2d at 757.

In determining whether pretrial detention is appropriate, the court should consider four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the person's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *see also* 18 U.S.C. § 3142(g).

## IV.    DISCUSSION

As found by the Court at the last detention hearing, the § 3142(g) factors pointed, and still point, in one direction – detention.

1. **Nature and Circumstances of the Offense**

In the world of federal gun possession crimes, possessing an unregistered .50 caliber machine gun is among the most serious and dangerous. This is a gun with military, war-time capabilities. By Defendant's own admissions, this machine gun could fire 550-650 rounds a minute. In the hands of someone with bad intentions, that many rounds of .50 caliber ammunition – as depicted by the representative .50 caliber round at the far left in the photo below – could be devastating.



There are several facts of this case that ratchet the seriousness and dangerousness of this offense to higher levels:

GOVERNMENT'S OPPOSITION TO RELEASE MOTION
*United States v. Emry,* 6:16-mj-00056-JR                                                            Page 4 of 15

(1) Defendant admitted he stole the .50 caliber machine gun from a man in Idaho. This man in Idaho confirmed the same and valued the machine gun at approximately $25,000.00.

(2) Defendant admitted he transported the machine gun from Idaho to Oregon earlier this year (which constitutes a separate potential criminal charge pursuant to 26 U.S.C. § 5861(j)).

(3) Defendant admitted that prior to bringing the machine gun to Oregon, he obliterated the serial number, as depicted in the photograph below. This act rendered the firearm either untraceable or significantly harder to trace.



(4) Defendant's move from Idaho to Oregon coincided with the armed occupation of the Malheur National Wildlife Refuge ("MNWR") in Harney County,

Oregon. In fact, on the day of the execution of the search warrant, Defendant admitted to agents that he traveled from Idaho to Oregon in late December 2015 in a van loaned to him by Ammon Bundy, one of the leaders of the armed occupation of the Refuge. Upon arrival in Oregon, Defendant stayed in a house in Burns, Oregon with Ammon Bundy, Ryan Payne, and other militants.[1]

(5) On January 11, 2016, a Deschutes County Sheriff's Deputy reported that Defendant approached a checkpoint at the Tactical Operations Center at the Burns, Oregon airport and told the Deputy that there was a .50 caliber belt-fed machine gun on the refuge. Law enforcement perceived Defendant's statement regarding the .50 caliber machine gun as an attempt to intimidate them.

(6) According to the cooperating witness in this case, Defendant stated he wanted to take the .50 caliber machine gun onto the MNWR during the occupation but he could not because of the law enforcement presence. The cooperating witness also relayed that Defendant has a large arsenal of weapons, access to grenades,

//
//
//
//
//

---

[1] Ammon Bundy and Ryan Payne are two of the defendants charged in the criminal case involving the armed occupation of the MNWR, U.S. District Court of Oregon Case No. 3:16-CR-00051.

GOVERNMENT'S OPPOSITION TO RELEASE MOTION
*United States v. Emry,* 6:16-mj-00056-JR                                    Page 6 of 15

spoke about shooting police officers and how a bullet from the .50 caliber machine gun would penetrate the side of a police car and a Kevlar vest.[2]

Independent of the cooperating witness in this case, a second unrelated confidential source ("CS") relayed in late May 2016 that he/she was glad that law enforcement seized the .50 caliber machine gun. According to this CS, one of the occupants of the MNWR, Darryl Thorn, had talked about the .50 caliber machine gun, wanted another occupant to help retrieve it from Defendant, and asked for training on how to use the .50 caliber rifle.[3]

(7) Just prior to the execution of the search warrant to seize the machine gun, Defendant was in negotiations to sell the machine gun in Oregon to a person Defendant had been told was a felon and the captain of a Texas militia group (this person was in fact an undercover law enforcement officer).

//
//
//

---

[2] As was made clear in the search warrant affidavit and at the last detention hearing, this cooperating witness has been dishonest and unreliable in the past, and carries significant baggage. However, the cooperating witness proved correct when he/she said Defendant was in possession of a .50 caliber machine gun. And prior to executing the search warrant, FBI agents were able to listen to separate recorded calls of Defendant discussing, and expressing his desire to sell, his .50 caliber machine gun.

[3] Darryl Thorn is one of the defendants charged in the criminal case involving the armed occupation of the MNWR, U.S. District Court of Oregon Case No. 3:16-CR-00051.

(8) Defendant, contemporaneously with his possession of the machine gun, possessed a belt of blank .50 caliber shells as depicted in the photograph below.



//

//

//

//

//

//

//

(9) At the same time he illegally possessed the machine gun, Defendant illegally possessed a destructive device – specifically, a blasting cap which is a detonator for a bomb – as depicted in the photograph below (which constitutes a separate potential criminal charge pursuant to 26 U.S.C. § 5861(d)).



(10) Defendant contemporaneously possessed the parts to manufacture yet another machine gun.

## 2. Weight of the Evidence

The weight of the evidence is strong and again points in favor of detention. There are recorded conversations, made prior to the seizure of the gun and Defendant's arrest, of Defendant discussing the .50 caliber rifle and how it's fully

GOVERNMENT'S OPPOSITION TO RELEASE MOTION
*United States v. Emry,* 6:16-mj-00056-JR                                              Page 9 of 15

automatic. Defendant confessed to federal agents multiple times about how he stole the machine gun in Idaho, obliterated the serial number, brought it to Oregon, and knew he had broken the law. And he confessed to the crimes in recorded jail calls post-arrest.

### 3. History and Characteristics of the Defendant

This factor too weighs in favor of detention. While Defendant is quick to emphasize his age, marital status, highly regarded skills as a gunsmith, and lack of significant criminal history, he neglects, for good reason, to mention his history of illegally making a bomb out of C-4 and a silencer for a drug dealer to kill potential witnesses. Defendant's bomb had the potential to blow up a room three times the size of a federal courtroom and "put a couple foot crater in the center of the area and blow every single wall out and just turn it into cinder." Govt. Ex. 1 at 1793 (Defendant's 2004 trial testimony in *United States v. Kenneth Kimball, et al*, U.S. District Court, Middle District of Tennessee, Nashville Division, Criminal Case No. 3:02-CR-00053, Doc. 558). Defendant further testified that he was "not very proud of this, I should have better discretion, should never have got myself involved with it," and knew that the bomb he made "could cause great harm" and was "highly, highly illegal." *Id.* at 1790-91.

Nor does Defendant mention that in the past he illegally "built upwards of 66 machine guns, belt fed" for a friend's weapons locker in case there was a civil revolt, and that this friend he armed with 66 machine guns became increasingly "paranoid

and radical." Govt. Ex. 1 at pp. 1784-85. Or how Defendant had also received detonators for bombs from this person. *Id.* at 1784.

All told, if anyone was attuned to the illegality and seriousness of these types of offenses, it was Defendant, as highlighted in the following exchange from his 2004 trial testimony:

| | |
|---|---|
| QUESTION: | You were aware that you possibly were looking at a mandatory 30-year sentence if a bomb was used in a violent offense? |
| EMRY: | Yes, sir. |
| QUESTION: | And you knew that a bomb and a silencer was used, two items, in separate events, it was a mandatory life sentence, sir, did you know that? |
| EMRY: | I didn't know anything about that. |
| QUESTION: | You didn't know? |
| EMRY: | I knew it was a maximum heavy sentence and you might as well spend the rest of your life in jail. |

Govt. Ex. 1 at p. 1830.

Years ago he was caught, avoided prison, had a chance to learn his lesson and live a life free of illegal weaponry. He either did not take that lesson to heart or simply does not care – and the fact that he has continued to engage in similar conduct tells the Court he may not be trusted to abide by Court ordered conditions.

As a final point on this detention factor, Defendant does not have deep-seated ties to Oregon or a history of steady employment here, which poses a risk of flight.

He only recently relocated to Oregon from Idaho, living in a moveable trailer and bringing with him a dangerous, illegal weapon in the process.

### 4. Nature and Seriousness of the Danger to the Community

A man with a history of making a bomb and silencer for a drug dealer to kill witnesses, and manufacturing 66 machine guns for another person in preparation for a civil revolt – who then brings a .50 caliber machine gun to our state during a time of unrest and then negotiates to sell it to someone purporting to be a felon and the captain of a militia – poses a serious danger to the community. Defendant has now accumulated a large enough track record when it comes to these types of offenses that he can no longer be trusted to cease his illegal behavior.

Several more portions of Defendant's 2004 testimony should be noted, as they shed light on Defendant's mindset when he brought the .50 caliber machine gun to Oregon earlier this year:

(a) When asked about how Defendant seemed cavalier about having made an illegal bomb, machine guns and a silencer, the following exchange occurred:

| | |
|---|---|
| EMRY: | Okay. It's not a past-time. It's just a due responsibility for every citizen to protect our very nation against any enemies, foreign and domestic. Unfortunately, our leaders are progressively putting us into a police state that no one wants. |
| QUESTION: | And everybody needs to get themselves together to protect themselves, right? |
| EMRY: | No, I think we should try to do it politically. But unfortunately our political measures and the deeds in |

|  |  |
|---|---|
|  | court aren't justified enough to get it done. And so I hope that it never comes to that day. |
| QUESTION: | So we need to get ourselves prepared with weapons? |
| EMRY: | Unfortunately, the only thing you're going to stop a bullet with is through brute force, and that's the only thing the history of this world has ever changed anything. |
| . . . . . . . . . |  |
| QUESTION: | You were doing nothing illegal at the time in your mind? |
| EMRY: | The only thing I did illegal, and I think that I did wrong in my own mind was if you're talking about the course of the laws and things that we say are illegal in our courts, yes, I did. The explosive's illegal. Our Constitution guarantees the firearms. |
| QUESTION: | Our government is wrong right now, right about guns? |
| EMRY: | Unfortunately they are, but we're going to have to fight through the courts and get our Congress to understand that the nature-- |
| QUESTION: | You believe it's appropriate to circumvent the law and nake (sic) the guns that you wish to protect this great nation? |
| EMRY: | I believe that unfortunately there's been examples and women and children are going the (sic) die because of these examples, and that's been like Waco and Ruby Ridge and, you know, all of these people have died standing for their principles. |

Govt. Ex. 1 at pp. 1813-15.

(b) Defendant then expressed that Timothy McVeigh was a loose cannon, and that he did not want a repeat incident of what Timothy McVeigh did "because in my book he wasn't concise." Govt. Ex. 1 at 1815. This exchange then occurred:

| | |
|---|---|
| EMRY: | This is what we call a soft war.  This isn't a war to go out and start shooting people.  Lord forbid I ever have to pull a gun on a law enforcement officer that's got a family and everything else. |
| QUESTION: | But you may have to? |
| EMRY: | I may have to if they start breaking the Constitution and the oaths that they upheld.  It strictly states in our constitutional law that we are to purge our government if they become out of control. |

Govt. Ex. 1 at pp. 1815-16.

(c) Defendant succinctly explained his ability when it came to manufacturing weapons: "Again, I have a natural aptitude for this stuff.  Nobody has ever trained me on any of this stuff.  Probably known as one of the top guys in the country to build guns that were cut from scratch.  I don't know why I have the aptitude but I do."  Govt. Ex. 1 at 1794.

Lurking behind this case is witness safety as well.  After being arrested, Defendant spent time on the phone talking to different people about who he believes the confidential witness is, and he's gone so far as to say, "He ain't going to escape this one."  And sure enough, according to the cooperating witness, he/she has received several phone calls since Defendant's arrest – a number of them were simply hang-ups, but at least one stated something to the effect of "We know where you are."

//

//

The quantity and significance of the anonymous threats have increased since the last detention hearing – with people telling the cooperating witness things such as "PHW we are coming for you" and "you are going to die."[4]

### V.    CONCLUSION

Detention is just as appropriate today as it was on May 24, 2016, and the United States requests that Defendant remain detained pending trial.

Dated this 13th day of July 2016.

> Respectfully submitted,
>
> BILLY J. WILLIAMS
> United States Attorney
>
> s/ *Nathan J. Lichvarcik*
> NATHAN J. LICHVARCIK
> Assistant United States Attorney

---

[4] According to the cooperating witness, PHW stands for Pale Horse Warning, a reference to death riding on a pale horse, and is a type of threat that originated with an unsavory group in the past. The cooperating witness believes that the PHW reference signifies that the threat is legitimate.

GOVERNMENT'S OPPOSITION TO RELEASE MOTION
*United States v. Emry,* 6:16-mj-00056-JR                                Page 15 of 15