1774

1      MR. SZEIGIS:  No questions.

2      MR. RODGERS:  Your Honor, no questions.

3      THE COURT:  Thank you, sir.  You can step down.

4      Who is our next witness, please?

5      MR. KOSHY:  Call Michael Emry.

6

7                    MICHAEL RAY EMRY,

8      having been first duly sworn, testified as follows:

9                   DIRECT EXAMINATION

10     BY MR. KOSHY:

11     Q.  Mr. Emry, how old are you?

12     A.  I'm 41.

13     Q.  What's the date of your birth?

14     A.  1-28-62.

15     Q.  All right.  Back in 2000, where were you working?

16     A.  I was working for Kittrell -- in 2000?

17     Q.  2000, yes.

18     A.  Okay.  I had recently just been employed with Kittrell's

19     Transmission, the summer.

20     Q.  And how about in 2001?

21     A.  I'm trying to remember the time frames.  It's 2001,

22     summer of 2001.

23     Q.  When you started at Kittrell's?

24     A.  Right.

25     Q.  Prior to that where were you working?

UNITED STATES DISTRICT COURT

GOVERNMENT
EXHIBIT
1
6:16-MJ-00056-JR

1775

1   A.  I worked at Heartland Transmission in Wichita, Kansas.

2   Q.  Are you a transmission man?

3   A.  Yes, I am.

4   Q.  What kind of work did you do at Kittrell's Transmission?

5   A.  I removed and reinstalled transmissions that were bad.

6   Q.  All right.  Who was the person in charge, manager, of

7   that shop?

8   A.  Ricky.  I only know him by Rick.

9   Q.  Ricky, what's he look like?

10  A.  About my height, gray hair, mustache.

11  Q.  How did you come to start working at Kittrell's?

12  A.  I looked through the phone books and just called around

13  some of the trans shops.  I had already worked at Aamco for

14  a couple of weeks and didn't like it, so I called Kittrell's

15  Transmission, he said come down.  And I talked with him, he

16  hired me.

17  Q.  All right.  Do you know the person by the name of Ken or

18  Ken Kimball?

19  A.  Ken was actually the owner of Kittrell's Transmission,

20  plus a couple other shops in the surrounding area.

21  Q.  Is he here in court?

22  A.  Yes, he is.

23  Q.  Can you tell the jury where he is seated or what he is

24  wearing?

25  A.  He's wearing a white shirt with a beard.

Gov't Exhibit 1, Page 2

1776

1    MR. KOSHY:  May the record indicate a correct

2  identification?

3    THE COURT:  Granted.

4  BY MR. KOSHY:

5  Q.  So after you worked, after you started working at

6  Kittrell's, how long did you stay?

7  A.  I worked from, oh, before July, sometime to around

8  November.

9  Q.  Of the same year?

10  A.  Yes.

11  Q.  And how are you able to remember that it was before July

12  when you started?

13  A.  Because around July -- July 4th I gave Ricky a little

14  blasting cap that I had stashed aside just for 4th of July.

15  Q.  And after that, well, at some point did you live in a

16  trailer?

17  A.  Yes.  That was -- oh, I don't know, towards the last of

18  when I left there.

19  Q.  As you were working at Kittrell's, did you do something

20  other than work on transmissions?

21  A.  Yes, I did gun shows and I worked on class two weapons,

22  started to, out of Chattanooga, Tennessee, for a class.  I

23  bought and sold military parts.

24  Q.  Tell the jury what a class two manufacturer is.

25  A.  Class two manufacturer is a licensed dealer that builds

Gov't Exhibit 1, Page 3

1777

1  military type weapons, fully automatic, for the military,

2  law enforcement, and in some instances private collectors,

3  reenactment in some industries.

4  Q.  And you said you started doing something with automatic

5  weapons?

6  A.  Yes.

7  Q.  I think you said something about gun parts.  What were

8  you doing?

9  A.  Oh, I was just selling basically.  You know, to

10 decontrol a machine gun it has to be destroyed per BATF

11 qualifications, that means destroying the receiver or the

12 registered components of said gun, you can have all the

13 other parts really, so all I was doing is selling the other

14 parts.

15 Q.  Were you getting different types of parts from different

16 places?

17 A.  Yes, I was.  Quite a few different places.

18 Q.  Have you provided information about those kinds of

19 things?

20 A.  Yes, I have.

21 Q.  All right.  Now how were you -- where were you getting

22 these parts shipped in to?

23 A.  Generally speaking, I got them shipped in to Kittrell's

24 Transmission on some occasions.

25 Q.  How would it come?

Gov't Exhibit 1, Page 4

1778

1   A.   Through UPS, almost all the time.

2   Q.   UPS, you mean U-P-S?

3   A.   U-P-S, yes.

4   Q.   What would you do with those things at Kittrell's, if

5   anything?

6   A.   I would inventory them immediately and then load them up

7   in my vehicle, take them to gun shows when I was ready to.

8   Q.   And as far as Ricky, did you ever provide him a firearm?

9   A.   Yes.   I provided him a -- let's see if I can remember

10   what kind it was.   It was a -- Russian .32 ACP pistol.   I

11   believe that's the caliber they called it.   I can't remember

12   the name of it.

13       Makarov.

14   Q.   Okay.   At some point -- well, at some point did you meet

15   Ken Kimball personally?

16   A.   Yes, I did.

17   Q.   How did that come to be?

18   A.   Well, probably a week after I started, you know, he come

19   in and he paid cash every day, you know.   Pretty nice guy,

20   seemed to be.

21   Q.   Did you start having conversations with him?

22   A.   Yeah, we talked and stuff.   We had some of the same

23   views, kind of respected him, you know.   He had some of

24   these different shops spread everywhere and stuff, seemed

25   like a hard worker, didn't drink or anything like that.

Gov't Exhibit 1, Page 5

UNITED STATES DISTRICT COURT

1779

1   Q.  You said you had some of the same views.  How do you

2   know he had some of the same views?

3   A.  Well, he was having problems with the city and stuff

4   that he related to me and, you know, trying to get a car

5   dealer auction yard set up and then the city was giving him

6   all kinds of problems for one reason or another.  Things of

7   that general nature.  Just disarray of some of our laws,

8   some of my political views as far as that goes,

9   constitutionally speaking.

10  Q.  And you're pretty vocal.  Were you pretty vocal about

11  your views?

12  A.  Yes, I was.  I always have been.

13  Q.  All right.  So did Ricky Dady know about your --

14  A.  Ricky, we sit around and talk about it, you know, talk

15  about certain things we didn't like about the government and

16  certain things that just weren't right through the justice

17  system, rights guaranteed versus the rights that aren't.

18  Q.  All right.  Political views on things?

19  A.  Yes.  Yes.

20  Q.  And did Kimball talk to you about those things?

21  A.  Not at first.  First we just, you know, Hi, how you

22  doing?  Then we got to know each other and sometimes I go

23  down to his other shop and sit down and drink coffee in the

24  morning, or come in and shoot small talk about stuff like

25  that.  Or it would be other things, cars, anything else, but

Gov't Exhibit 1, Page 6

1780

1    political views did come in the scope of things sometimes.

2    Q.  All right.  And at some point there did he ask you to do

3    something for him?

4    A.  Well, it was a very slow progressive thing.  Ken was

5    very -- he would come up and ask me, you know, because I

6    have the detonators, I let Ricky have, and stuff, I said

7    that I have C-4.  I hadn't.

8    Q.  At that point you didn't?

9    A.  At that point I didn't have it.

10   Q.  Who did you say that to?

11   A.  Ricky and Ken.

12   Q.  All right.  And what was Kimball's reaction when you

13   first started talking about C-4?

14   A.  He said, Let me know if you ever get any, I might want

15   some.  I said, Okay.

16   Q.  So you said there was a slow progression.  Tell the jury

17   in your own words how that happened and what was said.

18   A.  How that started?

19   Q.  Right.

20   A.  Well, I met somebody at the gun show and set up out

21   there, and they sold MREs and stuff.

22   Q.  What's an MRE?

23   A.  Meal ready to eat.  And they sold surplus military items

24   and backpacks, whatever.

25            Anyways, I was buying MREs for the man, Bruce Mawls

Gov't Exhibit 1, Page 7

1781

1   (ph.), and his son I met briefly because he had set up also,

2   we got to know each other.

3   Q.   I'm sorry?

4          THE COURT:  Can you pull the microphone a little

5   closer?

6          THE WITNESS:  Sorry.  His son I met briefly and

7   stuff, we started to get to know more.  And I was over at

8   another friend's house, which he was a friend of, and there

9   was a C-4 in the basement and he asked me if I wanted to

10  buy.  Well, I had never seen C-4.  So it was a novelty, I

11  bought it.  And about a week later I told Ken that I had

12  it.  And Ken was like, Well, I would like to have some.

13         At first he wanted just to buy the C-4, and they

14  wanted to have me make a bomb.  My understanding of making a

15  bomb was for putting it up for safekeeping for a trip wire,

16  some measure or other, never to be used in case of

17  emergency.  That would be -- I don't know if you know the

18  political views of a lot of people, but a lot of people have

19  worries that the government might start being very hard

20  ball, like the instances in Waco, so there is a fear factor

21  of the potential collapse of our government.  So some

22  certain individuals in this country feel like they should be

23  ready.  And that was the views that I understood.

24  BY MR. KOSHY:

25  Q.   When we previously talked about the views and Mr.

Gov't Exhibit 1, Page 8

UNITED STATES DISTRICT COURT

1782

1   Kimball shared those views, at least what he said, are those

2   the views you're talking about?

3   A.  Yes, it is.

4   Q.  So at first he was telling you about a trip wire device?

5   A.  Correct.

6   Q.  And what did he say he wanted a trip wire device for?

7   A.  Well, to put it in the storage house, he had some arms

8   and stuff he stored, and I didn't want to know, that was his

9   business.  But in case it was ever found, he wanted it to be

10  destroyed.

11  Q.  Well, a trip wire device, what did he say about he

12  wanted to be destroyed?

13  A.  Well, it could have been a roomful of items he didn't

14  want somebody to see, like if he had a cache of weapons or

15  ammunition or whatever the case may be, through personal

16  experience, a lot of people that have caches of weapons

17  across the country that hide them, you know, and that's one

18  of the common practices of --

19  Q.  You said this guy had some C-4 that you bought?

20  A.  Yes.

21  Q.  About how much C-4 was that?

22  A.  I believe it was about a pound, pound and-a-half.  I'm

23  not really for sure.  I didn't weigh it.  It was a fully

24  self-sealed-contained package though.

25  Q.  And do you recall how much you gave for it?

Gov't Exhibit 1, Page 9

UNITED STATES DISTRICT COURT

1783

1  A.  I gave like 250, something like that, 200, for the C-4.

2  In a general range.

3  Q.  So what happened after that when Kimball started talking

4  about the trip wire device and you had the C-4?

5  A.  Well, then he changed his mind, he wanted time delayed.

6  Q.  And what did you think at that point?

7  A.  I didn't know one way or another.  Kind of bothered me a

8  little bit.  But I thought, well, maybe he just wants to set

9  it and then, you know, maybe for safety.  So I said, Okay.

10  It's the very first bomb I had ever made.

11  Q.  All right.  How did you know how to make a bomb?

12  A.  Made my business to read the literature and understand

13  as much as I can about military techniques and tactics,

14  weaponry.  Probably one of the most versed as far as light

15  weapons around.

16  Q.  So once he talked to you about the time device, what did

17  you do?

18  A.  I went ahead and proceeded to make it.

19  Q.  How did you go about doing that?

20  A.  I started off with the C-4, scratching my head trying to

21  figure out what I was going to do.  So I first I needed a

22  timer device with a power source.  So I went to Wal-Mart,

23  looked around for clocks.  Found a clock that installed a C

24  battery.  One that would give the power source for the

25  detonator which requires one point five voltage generate to

Gov't Exhibit 1, Page 10

1784

1  detonate it.

2  Q.  Did you have a detonator at that point?

3  A.  Yes, I did.  I had some I had acquired from Kansas from

4  another friend that had a weapons locker that I helped with.

5  Q.  What was that friend's name?

6  A.  Phillip Baugh.

7  Q.  You said you helped with this locker.  What do you mean?

8  A.  It means that it was an old bomb shelter that stayed

9  locked unless there was a civil revolt and I built upwards

10  of 66 machine guns, belt fed, and submachine guns and AK 47s

11  and the like.  And he had some detonators that he had

12  acquired that I got from him.

13  Q.  About how many detonators did you get from Mr. Baugh?

14  A.  I believe it was like four maybe.  Something like that.

15  Maybe five, you know.

16  Q.  And --

17  A.  I don't know exactly for sure but it was a couple of

18  them, you know.

19  Q.  And you said you built some 66 machine guns.  You said

20  --

21  A.  Some 66 in number machine guns, yes.

22  Q.  Who did you provide those to?

23  A.  I provided those to Phillip Baugh.

24  Q.  And did you later advise ATF about that?

25  A.  Yes, I unfortunately had to.

Gov't Exhibit 1, Page 11

1785

1   Q.   And were those firearms recovered?

2   A.   Yes, they were.

3   Q.   And you didn't particularly like that, right?

4   A.   The reason I didn't like that because it was meant to

5   stay there until they rotted.   Not to be pulled out.   It was

6   an emergency clause.   But unfortunately Phillip Baugh

7   started becoming more and more paranoid and radical.   Takes

8   a great responsibility for something like that.   And

9   unfortunately, believe it or not, I do have that strong

10  conscience and I don't want any innocents hurt, and so my

11  conscience overrid my action and I came to you personally

12  over that and about the explosive without you ever coming to

13  me.

14  Q.   All right.   Let's go back to the detonator and C-4 and

15  you bought a clock.   What else did you do?

16  A.   Okay.   Once I purchased a clock, I came back, I had a

17  soldering gun, had some old electrical equipment because I

18  was going to make a movie industry gas gun for theatrical

19  use, simulation fire.   I had an electrical test board that I

20  purchased at Radio Shack a couple years ago.   And so I

21  thought, well, that would work.   I could connect the wire to

22  that, it's a good strong current, it would be reliable.   And

23  I needed something that would show me a hundred percent that

24  there was no power on that so I wouldn't blow myself up.   So

25  I installed some LED lights on it.   So once that thing is

Gov't Exhibit 1, Page 12

1786

1    polarized for the wires to go to the detonators, then it

2    will go off, you will know it.  So I did all of that.  Made

3    sure it was safe and I checked and checked and checked with

4    the mechanical matches.

5    Q.  What's a mechanical match?

6    A.  Mechanical match is exactly what it says, it takes one

7    point five volts to generate, and they use it for detonating

8    certain types of items, but all it does is like a nice spark

9    or a flash.

10   Q.  So how did you test it?

11   A.  I tested it with the clock by setting it with the timer

12   and once the lights flickered on it went poof.

13   Q.  All right.  What did you do then?

14   A.  Then I proceeded -- after I tested it over and over, I

15   proceeded with installing the C-4, with some cardboard box,

16   wrapping tape around it very tightly, all the electrical

17   components behind it, making access for the battery on the

18   back of the clock, which the wires were installed inside of

19   the clock, coming out to the board.  And proceeded to --

20   that's about it.  I put a hole in the center of it for the

21   detonator, keeping the detonator totally away from that at

22   all times, and the C-4, it will blow up if it's struck with

23   a match or anything else, it will only ignite with a

24   detonator.

25   Q.  You said you did something with a detonator, you sort of

Gov't Exhibit 1, Page 13

1787

1   made a motion, tell the jury what you did there.

2   A.   What I did, I took the detonator totally away from the

3   item, that I measured it, and I used a pencil to poke a hole

4   in the C-4 so there is an impression, snipped the C-4 for

5   the detonator to slide in.

6   Q.   Well, on these particular -- on that particular

7   detonator that was going to go with this bomb, do you

8   remember the length of the wires?

9   A.   Oh, the wires were extremely long.   I mean probably --

10  initially probably stretch from me to you, sir, coiled up.

11  I used some of the wire from the manufacturing units.

12  Q.   So originally the wires were, you said, a certain

13  distance, maybe six, ten feet?

14  A.   Something like that.

15  Q.   And you used part of it for doing what?

16  A.   Making the wire connections from the clock to the

17  detonator's connections.

18  Q.   All right.   And had you previously handdrawn -- did you

19  draw a diagram of how you did it?

20  A.   I did when I initially came to y'all.

21  Q.   And you drew that out yourself?

22  A.   Yes, sir.   Out of my memory.   I remembered what it

23  looked like and everything the best I could.

24  Q.   So you weren't looking at the bomb as you were drawing

25  it?

Gov't Exhibit 1, Page 14

1788

1  A.  No.

2  Q.  So what happened after you taped the C-4 and the

3  cardboard and did all of these things?

4  A.  I put it in a cardboard box, and about a day later I met

5  Ken at his office and handed it over to him.

6  Q.  Sorry.  What kind of box did you put it in?

7  A.  It was a shoe box.  I don't know what kind of shoes was

8  in it.  Just something I had laying around.  It's the right

9  size.

10  Q.  Let me have handed up, please, Exhibit 59 B.  Do you

11  recognize that?

12  A.  Yes.  It's the one I drew out.  It's a very rough

13  sketch, but gave the general idea.

14  Q.  Did you initial and date it on the date that you

15  provided it to the government?

16  A.  Yes.  MRE 11-5-2002.

17        MR. KOSHY:  We offer that as 59 B.

18        THE COURT:  Admitted.

19  BY MR. KOSHY:

20  Q.  You said you used a shoe box.

21  A.  Yeah.

22  Q.  Let me show you Exhibit 59 B 1.

23  A.  Yes, that's the shoe box.  That's the shoe box.

24  Q.  All right.  And have you made it -- you said you went

25  somewhere and met Defendant Kimball.  Where was that?

1789

1    A.  First I went down to the automotive place where

2    everybody met in the mornings, and then we went over to

3    Tank's Auto into his office.  Nobody knew about the item but

4    me and Ken.

5    Q.  All right.

6            MR. KOSHY:  We offer 59 D 1, the shoe box.

7            THE COURT:  Admitted.

8    BY MR. KOSHY:

9    Q.  So when you first met him at the automotive place, are

10   you talking about the mechanic shop?

11   A.  Well, there's another shop down the road and I forgot

12   the name of it.  It's just right down the street from

13   Kittrell's, like three shops in line; there's general

14   automotive, then Kittrell's Transmission, and then Tank's

15   Auto.

16   Q.  So you first met at the general automotive?

17   A.  Yes.

18   Q.  K and K?

19   A.  Yes, that's it.  K and K.

20   Q.  When you met him that day, what did you tell him before

21   you went to Tank's, if anything?

22   A.  What did I tell him before we went to Tank's?

23   Q.  Right.

24   A.  I just told him I had the item with me and we needed to

25   talk and I needed to go over the safety procedures of this

Gov't Exhibit 1, Page 16

1790

1   item.

2   Q.  Where did you have it at that point?

3   A.  I had it in my mini van.

4   Q.  And after you told him that, where did you go?

5   A.  We went straight over to Tank's automotive to his

6   office.

7   Q.  And what happened over there?

8   A.  Then very quietly, discreetly, we went in there and I

9   went over the safety procedures of this and I told him to be

10  responsible, put the thing up somewhere where it can't be

11  found, you know.  And demonstrated how it would work with

12  another electrical match so that he knew exactly how this

13  item worked with the LED lights coming up.  When those

14  lights are on, you attach those detonator wires, you're

15  going to die.  So I demonstrated with electrical match, I

16  went, Poof, gave the physical effect that he seen it.  I

17  said, Keep this detonator totally separate from this item

18  unless it's going to be installed.

19  Q.  And at that point when you gave these things to him, did

20  he have everything he needed to blow up the bomb?

21  A.  Sure.  He had everything he needed.

22  Q.  And you said you did this discreetly.  Why were you so

23  discreet about this?

24  A.  Well, I mean I'm not very proud of this, I should have

25  better discretion, should never have got myself involved

1791

1   with it, but that's beside the point.  Fact of the matter

2   is, that could cause great harm and it could also, also

3   highly, highly illegal so, you know.

4   Q.  So were there other people around while you're talking

5   about this highly illegal thing?

6   A.  No.  No.

7   Q.  Did you see --

8   A.  He actually -- excuse me.  He actually kind of would

9   come underneath the lift when I'm working and told me

10  quietly, Try to keep that away from anyone.  It was just our

11  understanding, which I respected that.

12  Q.  The day when you went over to Tank's, did you see

13  anybody else at Tank's?

14  A.  Ricky I think was down there, if I'm not mistaken, but

15  there's other people that worked down there and I -- I don't

16  remember faces and names as much as a lot of people,

17  especially after I spent a little bit of time, maybe if I

18  seen him I would recognize him, but it's just general people

19  that worked there every day, you know.  They would sit

20  around and shoot the shit and --

21  Q.  Do you know Al?

22  A.  Al, yeah, he worked over there at Tank's.

23  Q.  Do you know if he was around that day or not?

24  A.  He was up there I believe at that time at Tank's but I

25  didn't see him very long.  I was in and out.

1792

1   Q.   So who did you give the item to, the bomb?

2   A.   Ken Kimball.

3   Q.   When you gave it to him, what was it in?

4   A.   It was in a shoe box and I think I might have had a

5   brown bag over it, the shoe box, I can't remember for sure.

6   Q.   Let me show you out of Exhibit 59 F a yellow bag.   Do

7   you recognize that?

8   A.   I can't remember honestly if there was a yellow bag or

9   brown bag.   I knew I had it in a bag.   But I don't know for

10  sure.

11  Q.   All right.   Can you recall any more about what, if any,

12  questions Kimball asked you?   You were demonstrating how

13  this thing would be used or stored.

14  A.   Well, before, we really didn't discuss anything more

15  than that because it was a real brief talk about the

16  responsibilities of it, but before I told him what the yield

17  would potentially be and tried to make him understand the

18  threat level of this and the responsibility that goes along

19  with it.

20  Q.   Why did you want to tell him about that?

21  A.   Because I don't -- I wanted him to be responsible.   I

22  was already having a problem with Phillip Baugh getting a

23  little crazy and I just wanted him to understand where the

24  point of view is coming from and make him also understand

25  the safety.   I didn't want him to kill himself.

Gov't Exhibit 1, Page 19

1793

1   Q.  What did you tell him at that point about what this

2   thing would do?

3   A.  Well, Kittrell's Transmission is probably three times

4   the size of this building -- this room.  I should say this

5   enclosure.  You have lifts and bays and a separate area.

6   Probably put a couple foot crater in the center of the area

7   and blow every single wall out and just turn it into cinder.

8   Q.  And that's what you told Kimball?

9   A.  That's what I estimated the yield to potentially be.  I

10  don't know for sure, but it would be close.

11  Q.  But is that what you told him?

12  A.  Yes.

13  Q.  What was his reaction to that?

14  A.  Oh, Cool, you know.  Good.

15  Q.  So after you gave him this bomb, what did you do?

16  A.  That was pretty much the end of the conversation on

17  that.

18  Q.  Have you ever built a silencer?

19  A.  Yes, I have.

20  Q.  And just tell the jury how that came to be.

21  A.  This is one of the first things that Ken really asked me

22  about, explosives, just joking about, but he had mentioned

23  he had squirrels and stuff like that at his place, he didn't

24  want to wreck his neighbors, he wanted a .22 pistol or a .22

25  rifle, silencer or something.  So he bought a .22 pistol

Gov't Exhibit 1, Page 20

1794

1   from me and brought it back and had a little tube on it with

2   some holes drilled on it and, Do you think you can make a

3   silencer?  I said, Well, sure.

4        So I commenced to start from scratch.  And I took a

5   metal tube, drilled holes through it, and the barrel was

6   already threaded so there was a means of attachment, so all

7   I had to do is tap the part that I used, all this stuff is

8   scrapped from the tranning shop, and had a tube with like

9   Brillo pads or steel wool packed inside of it, and an outer

10   cap that was totally sealed.  And on the end, I went to

11   Wal-Mart and bought a lawn mower muffler.  The reason I used

12   that is you have to have something that will close the area

13   around it so you shoot one bullet through it and there's a

14   sealed ring in the center of it, plus it has the obviously

15   muffle effect, muffler, and the bullet will pass through it

16   and try to silence it as best it can.

17   Q.  How did you know how to make a silencer?

18   A.  Again, I have a natural aptitude for this stuff.  Nobody

19   has ever trained me on any of this stuff.  Probably known as

20   one of the top guys in the country to build guns that were

21   cut from scratch.  I don't know why I have the aptitude but

22   I do.

23   Q.  And is that a deep interest of yours?

24   A.  Huh?

25   Q.  Do you have a deep interest in it as well as an

Gov't Exhibit 1, Page 21

1795

1   aptitude?

2   A.  I have a deep interest, but more progressively I'm

3   backing off from it.

4   Q.  Okay.  But based on that, did you know how to make it?

5   A.  Yes, sir.  Several different types if I wanted.

6   Q.  All right.  Now when you said you got all of these

7   pieces and put this thing together, at that point what color

8   was it?

9   A.  When I was finished with it?

10  Q.  After you put it together, what color was it?

11  A.  I had it painted because it was just like welded,

12  there's welds all over it, so I polish it off and put a gray

13  black paint on it.

14  Q.  Before you painted it, what general color would it have

15  been?

16  A.  Just the color of metal, ground away.  Might have been

17  some paint on the parts here and there that didn't buff away

18  and stuff, but it was all silver in color.  You know, bare

19  metal.

20  Q.  Who else would have known that you were building this

21  silencer?

22  A.  Well, Ricky knew a little bit about it.

23  Q.  And you talked about providing a .22 to Kimball?

24  A.  Right.

25  Q.  When did you provide that?

Gov't Exhibit 1, Page 22

1796

1   A.   It was probably a week before I started building it.

2   Q.   And that's when he came back with this tube on it, is

3   that correct?

4   A.   Yes.

5   Q.   You said he came back with some tube?

6   A.   Yes.

7   Q.   What kind of tube?

8   A.   I think he thought that would be a good way to start

9   with it, you know.  And I scrapped that and used something

10  else.

11  Q.   Now when he asked you initially for the .22, about this

12  squirrel hunting or whatever, did he ask that for squirrel

13  hunting?

14  A.   Well, he said he basically had a lot squirrels around

15  his yard and stuff like that and a .22 is a good varmint

16  gun.  A lot of guys use pellet guns and stuff, but I know a

17  lot of guys that's got .22 Rugers who have made silencers

18  themselves and they use them for keeping them out of the

19  bird feeders and everything else.

20  Q.   So why did you pick out the particular .22 that you did

21  which you then gave to him?

22  A.   Well, one, it was cheap, I got it for like $79, and I

23  asked him if he wanted to buy it.  He said he did, and he

24  asked if I could maybe silence it.  Said, I don't know,

25  maybe.  That's when he come back with a tube on it.

Gov't Exhibit 1, Page 23

UNITED STATES DISTRICT COURT

1797

1   Q.   So do you remember what kind of firearm that was?

2   A.   It's a -- called a Beesa (ph.).   I don't know the

3   manufacturer of it.   It's a foreign manufacturer I believe.

4   Q.   Is there something particular about the front of that

5   gun, the muzzle of the gun?

6   A.   Yes, there is.   There is a cap and it's already threaded

7   and actually designed for the use of silencers.

8   Q.   All right.   So at the time that you bought this

9   particular Bersa .22, --

10  A.   Bersa, that's the name of it.

11  Q.   I'm sorry?

12  A.   Bersa.   I mispronounced it.

13  Q.   All right.   When you bought this particular Bersa .22,

14  did the fact that it already had this threaded barrel have

15  anything to do with --

16  A.   Not at the time I purchased it.   I just got a deal on

17  it.   I had a couple pistols and happened to be one of the

18  ones that I had.

19  Q.   Let me have handed up to you Exhibit No. 61 B.

20  A.   Yes.   This is the pistol that I sold him.

21  Q.   Do you remember about how much he gave for it?

22  A.   You know, there again, you know, time goes by, I don't

23  remember how much.   I don't know, 250.   250, maybe 200.

24  Q.   So were you making some money on it?

25  A.   I made a little bit, 75 percent usually on every sale.

Gov't Exhibit 1, Page 24

1798

1   Q.  All right.  Now do you know how Kimball knew to come to

2   you to buy guns?

3   A.  Well, I was moonlighting on the weekends at gun shows

4   and I would keep some of my inventory there.  I built a few

5   dummy guns, built some semi 1919 belt-fed machine guns.  And

6   they weren't machine guns, they are semiautomatic, but they

7   are legal to own in that state.

8   Q.  Did you make any secret out of what you were doing with

9   that?

10  A.  No.  I didn't care who knew because I wouldn't do

11  anything illegal.

12  Q.  At some point other than this Bersa, did you have some

13  kind of gun transaction with Kimball?

14  A.  Well, he came up with an Enforcer carbine that he wanted

15  to know if I could -- if I wanted it.  I looked at it, had a

16  couple clips, this is basically an M1 carbine that's been

17  shortened down by a company in Florida, like to the size of

18  a pistol.  You know, the unique thing with this one, it had

19  a Selectra in it, it was fully automatic, but he wanted two

20  Glock pistols.  There's some money involved in the trade,

21  you know.  I can't remember exactly how much.  But the deal

22  was he wanted the Glock pistols, give me a little bit of

23  money and that Enforcer.  I said, Okay.  I took the parts

24  out of the Enforcers, because it was a legal gun then, it

25  could be sold anywhere and I sold it at the gun show.

Gov't Exhibit 1, Page 25

1799

1   Q.   Where did you get -- you said you got some Glocks?

2   A.   Yes, from a dealer, and I can't remember the dealer.   I

3   had a lot of records stolen from me that I can't find the

4   receipts of.   But it was a gun dealer down there and

5   probably a record of the pistol purchase around that time

6   period of two Glocks.

7   Q.   All right.

8   A.   Because I signed my name to it and --

9   Q.   Were you a felon or anything?

10  A.   No.   I'm not a felon.   I don't have any criminal history

11  at all.

12  Q.   So do you remember what model Glocks those would have

13  been?

14  A.   I believe they were 27s.

15  Q.   Why was he interested in the Glock 27s?

16  A.   Well, he likes Glocks, for one, and the other is that

17  they are a smaller, more low profile.   They have smaller

18  grips.   And he wanted one.   They are a good back-up gun.

19  Law enforcement officers have them in their boots and

20  stuff.   But they are also a good weapon for a female because

21  they are small, they can put them in their purse, and that's

22  another reason why he wanted it too, for his wife.

23  Q.   One for him, one for his wife?

24  A.   Yes.

25  Q.   Did he say how he had this fully automatic Enforcer?

Gov't Exhibit 1, Page 26

UNITED STATES DISTRICT COURT

1800

1    A.   No, he didn't.  You know, one thing I have learned a

2    long time ago, I didn't care to know where a uncontrolled

3    machine gun came from.  Nor would anybody tell you.

4    Q.   All right.  Now of the three things that we have talked

5    about so far, the Glock 27s for the Enforcer, the bomb and

6    the silencer, can you put those for the jury in the order in

7    that they happened?

8    A.   In the order they happened?

9    Q.   Yes, please.

10   A.   First, I gave the -- first, I sold the pistol to Ricky,

11   then I gave him a blasting cap or two for 4th of July.  Then

12   came the Enforcer, that was before the explosives and stuff,

13   you know, that trade.  And then came probably right almost

14   at the same time the silencer with the pistol.  And then the

15   explosives.

16   Q.   All right.  And when did Kimball allow you to live

17   behind the shop and all that?

18   A.   I was going through a separation from my wife, and I was

19   looking for a camper to live in, and we were having

20   problems, break-ins in the back and stuff, and I'm real bad

21   on dates.  I don't know if it's old timers or what, but I'm

22   trying to pin this down the best I can.  I think it was

23   probably before the 4th, or around the 4th, probably right

24   in that period of time that I got that trailer.

25   Q.   How long did you stay there in the trailer?

Gov't Exhibit 1, Page 27

1801

1  A.  Well, off and on.  I would be there, you know, three or

2  four nights out of the week, then on the weekend I would be

3  gone all weekend.  But I don't know, about a month or so.

4  Q.  All right.  So at the time that you gave Kimball the

5  silencer or the bomb, was the trailer still there or not?

6  A.  I believe it was.

7  Q.  And then after at some point did the trailer have to get

8  moved?

9  A.  Yes.  I moved it.  I had to quit around November because

10  I was doing so much at the gun shows, plus some things that

11  I didn't like going on, it bothered me.

12  Q.  You were seeing things like that?

13  A.  Yeah.

14  Q.  All right.  Now you said you, along with that Bersa that

15  we have talked about, you had the silencer?

16  A.  Yes.

17  Q.  Did you fire the silencer?

18  A.  I fired one shot through it to punch the hole, the

19  center, and then another shot for seeing the actual sound.

20  It didn't reduce it like I would like and I'm more of a

21  perfectionist, but it did at least 60 percent.

22  Q.  All right.  Let me have handed up to you Exhibit 61 A.

23  Do you recognize that?

24  A.  Yes.  That's it.

25  Q.  It, meaning?

Gov't Exhibit 1, Page 28

1802

1   A.  This is the silencer that I built for him.  A hundred

2   percent.

3   Q.  Go ahead and take that out, please.

4   A.  Okay.

5   Q.  If you would hold it up and tell the jury what the parts

6   are and how you made it.

7   A.  Okay.  The first thing you have to start off with is

8   something to attach to the barrel, which is just basically a

9   tube.  Normally if you got a longer barrel, you want a port

10  in an existing barrel, but on a pistol, that is the only way

11  you can do it.  So you have a tube going all the way out,

12  probably to here, with holes drilled into it, kind of like

13  you have seen a machine gun barrel with holes, and then I

14  had steel wool packed inside of it, here, a washer on the

15  back where it's welded so you have got like a cup.  Then I

16  took the lawn mower muffler and I screwed it into the end of

17  that tube, then I joined the outside of the tube to this

18  muffler.  And it was a done deal.

19  Q.  All right.  Now on the end that you attach to the Bersa,

20  you talked about how you did do that?

21  A.  Okay.  There are things called tool and die taps and you

22  can tap threads, like strip threads out, you can come in and

23  rering the taps and make new thread, and that's what I did

24  with this, and I threaded it to match the end of the Bersa

25  the best I could so it would screw in tight.  And that's all

Gov't Exhibit 1, Page 29

1803

1    I had to do because the end of the barrel already has an end

2    that unscrews.

3    Q.  You had to unscrew it?

4    A.  Right.

5    Q.  Take it out.  Go ahead and unscrew the shroud, the

6    shroud, and attach the silencer.

7    A.  What this does, you can unscrew it and it will come off,

8    but the best thing to do is take it off, put it aside, then

9    take this and thread it in.  Just keep threading until it's

10   tight.

11        Now the action will slide back but not obstruct the

12   weapon.  And in some pistols you have to buy extended

13   barrels, this one you didn't.

14   Q.  Just set it down, please.

15        When you -- just tell the jury how you gave that

16   Bersa and the silencer to Defendant Kimball, where was it?

17   A.  He came in to Ricky's office and I handed it to him in

18   there and he looked at it, he liked it.  Ricky thought it

19   was neat.  Stuff like this, you know, there's so many

20   different applications for it, and I didn't -- Ken seemed

21   responsible, I never thought he would ever try to do

22   anything with it.

23   Q.  At the time you gave the Bersa and silencer to Defendant

24   Kimball, was it loaded?

25   A.  I gave him a mag.  I think I might have had some shells

Gov't Exhibit 1, Page 30

1804

1    in the mag.  I'm not for sure.  Usually I always hand a

2    weapon that's cleared and checked.  I might give them a

3    magazine that's loaded but not in the gun.

4    Q.  Did he pay you anything for that?

5    A.  He paid me like a hundred bucks for the silencer,

6    somewhere in that general nature.  I think the total price

7    was 350 for the total package, counting the purchase of the

8    pistol also.

9    Q.  All right.  Do you have any specific recollection of

10   exactly what date all this occurred?

11   A.  It was after the 4th of July, but not much further

12   after.  Probably within a month after.  Something like

13   that.  I can't pin it exactly down.

14   Q.  After you delivered these devices to Kimball, did you

15   notice any change in how Kimball was acting?

16   A.  I noticed that he started getting more and more

17   agitated.

18        You're saying after he gained control of the

19   explosive device?

20   Q.  Right.

21   A.  I noticed he got more and more agitated about his

22   wanting to set up his auto auction.  He said somebody was

23   giving him problems, trying to hurt him and stuff like that,

24   he made minimal statements about that.

25   Q.  What did he say at that point about somebody was trying

Gov't Exhibit 1, Page 31

1805

1   to hurt him?

2   A.  He said he had problems with somebody.  He had mentioned

3   that a couple times.  I never really thought too much about

4   it, but one day I was down at K and K and sitting down

5   drinking coffee and he was talking about, Son of a bitch, I

6   got a problem with a guy and I would love to get rid of

7   him.

8          Sometimes people vent and say they would like to

9   kill somebody and like to do this, that's kind of what I

10  thought he was doing, but later on in reflection I started

11  putting two and two together and some of the statements that

12  he had made about the IRS coming down and potentially

13  raiding the place and looking for confiscating paperwork, I

14  thought, well, --

15  Q.  He made statements like that about you?

16  A.  Yes, he had.  That was something he had mentioned a

17  couple months back.  You know, a lot of people have tax

18  problems.  And I thought that Kittrell's Transmission was a

19  tax write-off because he paid in cash every day.

20  Q.  After you gave Kimball the bomb, did Al Lock say

21  anything to you?

22  A.  Next day I had to come down for something, papers to

23  sign on the van they'd purchased, he let me use it for a

24  while, then I finally bought it, something like that, and

25  then Al said something of the nature, Nice work.  And I

Gov't Exhibit 1, Page 32

UNITED STATES DISTRICT COURT

1806

1   suppose he was talking about the explosive, but I don't know

2   for sure, he didn't relate explicitly to that, but that's

3   what I assume he was saying.

4   Q.  At some point did you try to get the bomb back?

5   A.  I had mentioned to Ken just before I left that it might

6   be a good idea to get the item back.

7   Q.  Why did you do that?

8   A.  He wouldn't get back with me.  I was getting a little

9   nervous.  And I figured I'm just -- I was just ready to move

10  on, I just left.  I didn't know what was going on.  I

11  started -- I just kind of walked away from it, ran away from

12  the place.

13  Q.  Why did you ask him about getting it back though?

14  A.  I was having misgivings about doing it.  My conscience

15  was really bothering me and I -- I have a sense that

16  probably would serve me well in a harmful area because I can

17  always tell if there's danger and I just felt something is

18  wrong, something is amiss.  I couldn't pin it.

19  Q.  When you asked for it back, was that before or after he

20  made that statement you have already talked about about

21  getting rid of somebody?

22  A.  Oh, that was after.  That was after I quit.  It was just

23  before I was getting -- it was before Christmas.

24  Q.  When you asked --

25  A.  Just before I quit.

Gov't Exhibit 1, Page 33

1807

1    Q.   I'm sorry.  When you asked Kimball to get the bomb back,

2    what did he say?

3    A.   Really didn't say too much.  It was like, blew it off,

4    you know.  And then he was getting increasingly harder to

5    get hold of and stuff.  So I finally just said the heck with

6    it, it will be okay, just trying to reassure myself it's

7    going to be okay, then I quit.  And I started just doing gun

8    shows a hundred percent.

9    Q.   Now at some point did you become aware that this bomb

10   had gotten seized?

11   A.   I didn't know that the bomb had gotten seized until

12   after I came to the ATF and talked to them about it.

13   Q.   All right.  Do you remember when that was?  When you

14   found out that it had been seized?

15   A.   Well, I came to the ATF in October of -- last year.

16   Q.   All right.  Before you came, at some point were you --

17   A.   The year before I mean, yeah.

18   Q.   I'm sorry, I lost track of the years.  Which years?

19   A.   It wasn't last October, it was the October before.

20   Q.   October '02?

21   A.   Yes.

22   Q.   Okay.  At some point were you in the Williamson County

23   jail for something?

24   A.   I had an individual --

25   Q.   I'm not asking what it was, were you in the jail?

Gov't Exhibit 1, Page 34

1808

1   A.   Yes, I was.

2   Q.   Did they come to interview there?

3   A.   They came and interviewed me, but I had already talked

4   to the ATF a week before.

5   Q.   All right.  Where did you talk to ATF the week before?

6   A.   In Knoxville.  I was working for a class two

7   manufacturer, I don't want to mention his name, doing

8   machine guns for him.  And he reenacts and does stuff in the

9   movie industry.  And while I was at work and doing the guns,

10  I went ahead and called the ATF and stuff like that, figured

11  I was cutting my own throat, but I didn't want anybody

12  getting hurt, so I told them about the two instances that

13  we're relating to now and dealing with Phil Baugh in Kansas

14  and then the explosives.

15  Q.   Was that an anonymous tip?

16  A.   No.  I told them who I was.

17  Q.   All right.  At some point when you were interviewed at

18  the jail, did you say you didn't know anything about a bomb?

19  A.   Well, I had already told them that about I knew where

20  some C-4 was but I didn't know that they had found the

21  bomb.  And at that time I was scared, okay?  And I lied at

22  first trying to protect myself, okay?  But this was not just

23  Ken but another individual that I was worried about that was

24  -- the one that sold me the C-4 because he was just

25  indiscriminately wanting to sell me other items which I

1809

1  didn't want out in the world and plus after 9-11 my

2  viewpoints have changed considerably.

3  Q.  And at some point did you decide to make a clean breast

4  of everything?

5  A.  Yes.  This was -- I got out of jail, I flew back to

6  where I was at, and had some problems up there, then I came

7  back and took care of that court case.  And all this time I

8  was in direct contact with ATF and also the FBI.

9  Q.  All right.

10  A.  Then I started helping with another case up there.

11  Yes.

12          MR. KOSHY:  Pass the witness.

13          MR. TAYLOR:  May we approach?

14          THE COURT:  Yes.

15          (Whereupon, a bench conference was had out of the

16          hearing of the jury.)

17          MR. TAYLOR:  Because of the nature of the

18  testimony, and the reference to the Patriot Act, I'm

19  concerned that my full lack of understanding of the Patriot

20  Act may mean there might be some materials that the

21  government is in possession of that may be considered under

22  the Patriot Act not available to me.  And I want to bring

23  that to the court's attention because -- whether it is or

24  not, I would ask the court to consider that in terms of my

25  request if there are any materials available.

Gov't Exhibit 1, Page 36

UNITED STATES DISTRICT COURT

1810

1       THE COURT:  Can you think back on any statute?

2       MR. KOSHY:  I don't know anything about it.  I'll

3   ask.  I haven't asked if there is any classified materials,

4   if that's what he is talking about.

5       THE COURT:  Are you talking about classified

6   material?

7       MR. TAYLOR:  Well, Judge, my problem is the Patriot

8   Act is a little bit confusing right now.  I'm not exactly

9   sure of the elements of the Patriot Act completely, but I

10  believe the basis of his testimony and what I know to be the

11  investigations that I have knowledge of and the paucity of

12  the information that I have about him suggests there is

13  potentially more information about him.  Particularly in

14  light of he just gave a statement that this conflicts with

15  the <u>Jencks</u> material and that I had previously cooperated

16  with the agent in Knoxville, prior to October 7th.

17      MR. KOSHY:  I mean I'll check with the agent and

18  see if we haven't turned over -- a lot of statements have

19  been turned over to Mr. Taylor.  I haven't withheld

20  anything.

21      MR. TAYLOR:  I would suggest that I go on and if it

22  comes up I be allowed to recall him.

23      THE COURT:  All right.  And, Mr. Koshy, you check

24  to see if anything is being withheld.

25      MR. KOSHY:  Yes, sir.

Gov't Exhibit 1, Page 37

1811

1          THE COURT:  Then we can determine if it's properly

2  so.

3          MR. KOSHY:  Yes, sir.

4          THE COURT:  Find out what it is.

5          (Whereupon, the following proceedings continued in

6          open court.)

7          MR. TAYLOR:  If I could have just a moment, Your

8  Honor?

9          THE COURT:  Yes, sir.

10

11                  <u>CROSS-EXAMINATION</u>

12  <u>BY MR. TAYLOR</u>:

13  Q.  Mr. Emry, do you recall meeting with the grand jury?

14  A.  Yes, sir, I do.

15  Q.  And do you recall being interviewed the night before?

16  A.  Yes.

17  Q.  And do you recall indicating to investigators that night

18  that you believed that you had manufactured the bomb but

19  because of the particular significance of 9-11 you remember

20  delivering the bomb after 9-11, is that what you said?

21  A.  See, I have a real big problem with my memory as far as

22  time elapsing.  My mind's fairly crisp, but I have problems

23  with times and dates, but I did probably say that it was

24  after, but I believe it was before.

25          MR. TAYLOR:  May I approach the witness?

Gov't Exhibit 1, Page 38

1812

1    THE COURT:  Yes.

2    BY MR. TAYLOR:

3    Q.  Would you read right here?

4    A.  Yes.  Before 9-11.  See that was the point where I

5    couldn't believe it was before or after.  The only thing I

6    remember is I had great regret for doing it, so --

7    Q.  I understand, but reading that, would you say that's

8    incorrect?

9    A.  I would say that I'm almost certain going back through

10   the time periods and stuff that it was before 9-11.

11   Q.  All right.  Let me show you one more.

12   A.  Sorry, I can't see very well.  I don't have my glasses.

13   Make it's before 9-11.

14   Q.  Would you read that?

15   A.  I agreed to make it before 9-11 and then I think I put

16   it together right after 9-11.

17   Q.  All right.  9-11, would you read this one?

18   A.  Okay.  Asked him to make a -- AK asked him to make a --

19   I think it says bomb.  Something before 9-11 or September.

20   Actually delivered the item after 9-11.

21   Q.  All right.  So does that refresh your recollection?

22   A.  I'm certain I delivered it before.

23   Q.  Even though what you read here?

24   A.  Right, because I have had time to try to reflect on the

25   time frames, only thing I can do is like when you're giving

Gov't Exhibit 1, Page 39

1813

1  an address, I can't say go to Fifth West Avenue, I have to

2  say use landmarks because I can't remember things.

3  Q.  Well, didn't you say just then that your memory is bad

4  now?

5  A.  Sir?

6  Q.  Isn't it true that your memory about an event would have

7  been better back at 9-11?

8  A.  Not necessarily.  I can't remember dates from last week

9  and what I did.  I don't know if it was Tuesday or Wednesday

10  but I remember what I did.  It's the problem I have.  I had

11  a car wreck and it disassociated -- I don't know how to

12  explain it -- time and conjoining between it.

13  Q.  Time gets confused?

14  A.  I get confused on times and dates, and so they kind of

15  get mixed together and sometimes the only way I'm able to do

16  it is backtrack.  In looking for keys, well, I did this

17  before that, so, you know.

18  Q.  But today your memory's better than it was on this?

19  A.  I've had to backtrack my steps and try to think about it

20  and that's so that's --

21  Q.  Without regard to your apparent lack of memory?

22  A.  Yes, sir.

23  Q.  Seem awful cavalier about making bombs and machine guns

24  and silencers, kind of a past-time, no problem?

25  A.  Would you like me to answer why?

Gov't Exhibit 1, Page 40

UNITED STATES DISTRICT COURT

1814

1   Q.   Yes.

2   A.   Okay.   It's not a past-time.   It's just a due

3   responsibility for every citizen to protect our very nation

4   against any enemies, foreign and domestic.   Unfortunately

5   our leaders are progressively putting us into a police state

6   that no one wants.

7   Q.   And everybody needs to get themselves together to

8   protect themselves, right?

9   A.   No, I think we should try to do it politically.   But

10   unfortunately our political measures and the deeds in court

11   aren't justified enough to get it done.   And so I hope that

12   it never comes to that day.

13   Q.   So we need to get ourselves prepared with weapons?

14   A.   Unfortunately, the only thing you're going to stop a

15   bullet with is through brute force, and that's the only

16   thing the history of this world has ever changed anything.

17   Q.   And a silencer may become something necessary in the

18   future?

19   A.   To me I didn't think that he was going to use it against

20   anyone.   But there was potential that he could, had to use

21   it against powers to be, I don't know.

22   Q.   All right.   Besides squirrels, according to you?

23   A.   Oh, sure, could have used it for protecting his family.

24   Q.   You were doing nothing illegal at the time in your mind?

25   A.   The only thing I did illegal, and I think that I did

Gov't Exhibit 1, Page 41

UNITED STATES DISTRICT COURT

1815

1   wrong in my own mind was if you're talking about the course

2   of the laws and things that we say are illegal in our

3   courts, yes, I did.  The explosive's illegal.  Our

4   Constitution guarantees the firearms.

5   Q.  Our government is wrong right now, right about guns?

6   A.  Unfortunately they are, but we're going to have to fight

7   through the courts and get our Congress to understand that

8   the nature --

9   Q.  You believe it's appropriate to circumvent the law and

10   nake the guns that you wish to protect this great nation?

11   A.  I believe that unfortunately there's been examples and

12   women and children are going the die because of these

13   examples, and that's been like Waco and Ruby Ridge and, you

14   know, all of these people have died standing for their

15   principles.

16   Q.  Or Timothy McVeigh and what about --

17   A.  Timothy McVeigh was a loose cannon and I don't want a

18   repeat incident of a Timothy McVeigh because in my book he

19   wasn't concise.  This is what we call a soft war.  This

20   isn't a war to go out and start shooting people.  Lord

21   forbid I ever have to pull a gun on a law enforcement

22   officer that's got a family and everything else.

23   Q.  But you may have to?

24   A.  I may have to if they start breaking the Constitution

25   and the oaths that they upheld.  It strictly states in our

Gov't Exhibit 1, Page 42

UNITED STATES DISTRICT COURT

1816

1   constitutional law that we are to purge our government if

2   they become out of control.

3   Q.   How old are you, sir?

4   A.   I'm 41.

5   Q.   Have you had mental treatment of any kind?

6   A.   No.  Not that.

7   Q.   You have never seen a psychiatrist?

8   A.   Probably in the service and stuff.

9   Q.   Why in the service?

10  A.   Oh, I was smoking a lot of pot.

11  Q.   Ever seen a psychiatrist or been in any kind of mental

12  health treatment in the last ten years?

13  A.   No.  Not in the last ten years, no.

14  Q.   How about in the last 20 years?

15  A.   Well, I was in the Navy I smoked a lot of pot.

16  Q.   I'm not talking about pot.  I'm talking about somebody

17  who talks to you about maybe having supplemental health

18  problems.  Yes or no?

19  A.   Well, unfortunately I can't remember if I did.

20  Q.   You can't remember?

21  A.   No.  I have a problem before my wreck.  See, this is

22  what I have been trying to relate to you.

23  Q.   Did you hear what this lady said about under God?

24       MR. KOSHY:  The witness isn't being allowed to

25  finish his answer.

1817

1       THE COURT:  Finish your answer and then you can

2  follow up.

3       MR. TAYLOR:  Judge, I'm sorry, I couldn't hear.

4       THE COURT:  Finish your answer and then you can

5  follow up.

6       THE WITNESS:  Maybe I can help you understand

7  something.  I had a tranny shop before 1999 and I got into a

8  very violent car accident.  And it was bad.  I almost died.

9  And before then I had a very concise memory that I can

10  remember last week what I did that day, at that afternoon.

11  But after that wreck, and it cost me my marriage, I couldn't

12  remember half of the stuff that I used to.  My memory wasn't

13  half as clean and crisp as far as dates.  And a lot of

14  before then was a blur, and I'm not claiming amnexia, I'm

15  just saying that my memory is not as concise.  Yes, I have

16  seen a shrink before but I can't remember what it was all

17  about or anything.  I know it was because of the Navy.  You

18  know, I was having problems with family and I was smoking a

19  lot of pot, just like every other juvenile.

20  BY MR. TAYLOR:

21  Q.  Were you discharged as a result of your mental

22  condition?

23  A.  No.

24  Q.  Since the Navy, have you had any other mental health

25  counselling treatment?

1818

1   A.   I went through a separation with a girlfriend I was

2   having some problems with and I might have sought

3   counselling because of it.   But that's the only thing I can

4   recall, honestly.

5   Q.   You just said your memory has gone because of the car

6   wreck but you also said just now that you can remember

7   better today than you could in 2001 when you said you

8   delivered this bomb after 9-11?

9   A.   Unfortunately that's not true, sir.

10  Q.   You can remember better today?

11  A.   That's because I had to backtrack my steps just like if

12  you lost some keys.

13  Q.   It's a methodical process, two years later, three years

14  later, you step back one step at a time and you remember

15  what you said on a particular day?

16  A.   Not a particular day.   There is no way I can remember a

17  particular day.   I'm generalizing within a month, you know,

18  that's the only way that I can generalize, you know.   All I

19  can tell you is what I can recall.

20  Q.   Well, on this day, 4-23-03, it was seven months ago, you

21  were with agents when they questioned you, weren't you?

22  April 23, '03, somebody was sitting down there writing this

23  down?

24  A.   Yes, I come down and they flew me here and I met with

25  everybody and tried to remember the best that I could.

Gov't Exhibit 1, Page 45

1819

1    Q.  And at that point, on that day you remembered it as

2    being after 9-11 that the bomb was delivered?

3    A.  I knew -- at that time I knew it was that period of

4    time.  I don't know for sure.

5    Q.  For a person of your ilk, I'm going to say that because

6    you demonstrated, I believe it's fair to say, antigovernment

7    sentiments?

8    A.  No.  Patriotic sentiments.

9    Q.  Patriotic.

10   A.  I love my government.  I love my country.

11   Q.  9-11 is a day in your life, right?

12   A.  Yes.  Very sad day.

13   Q.  You were a fugitive from justice and arrested in Hayden,

14   Idaho, weren't you?  Yes or no?

15   A.  There's something that I need to discuss with -- can I

16   have --

17          THE COURT:  Why don't we take a break for lunch and

18   we'll talk about it?

19          Members of the jury, we'll break for lunch and come

20   back at one o'clock and we'll proceed.  Don't talk about the

21   case.

22          (Whereupon, the jury retired from the courtroom,

23          after which the following proceedings were had.)

24          THE COURT:  Mr. Koshy, what's this about?

25          MR. KOSHY:  I don't know.

Gov't Exhibit 1, Page 46

1820

1       THE COURT:  Okay.  Go ahead, sir.

2       THE WITNESS:  I don't want anyone knowing where I

3  have been because I have had a family member that's been

4  murdered and I fear for my own life.  So this gentleman here

5  stating places that I have been and stuff could be

6  potentially jeopardizing my life if not the lives of people

7  I know.

8       THE COURT:  What's the probative value of what

9  you're asking him?

10       MR. TAYLOR:  Well, Your Honor, the way I understand

11  it, snatched up in Hayden, Idaho, and brought back here to

12  the Williamson County jail and immediately began questioning

13  by the ATF.  I want to know the circumstances of the snatch

14  out there in Idaho and bringing him back to the Williamson

15  County jail and progressive interrogation of him from that

16  point forward and the interrogating that he's alluded to on

17  direct that I have never heard about that apparently

18  occurred before October the 2nd of 2002.

19       THE WITNESS:  Sir?

20       THE COURT:  Hold on a second.

21       Mr. Koshy?

22       MR. KOSHY:  May I have just a moment, Your Honor?

23  I'm looking at his criminal history.

24       THE COURT:  Yes.

25       MR. KOSHY:  May I approach Mr. Taylor?

Gov't Exhibit 1, Page 47

UNITED STATES DISTRICT COURT

1821

1        THE COURT:  Yes.

2        MR. KOSHY:  Your Honor, Mr. Taylor has stated the

3   basis for his question, asking if the defendant was arrested

4   as a fugitive from justice.  There is a print-out provided

5   to Mr. Taylor in discovery.  I have looked at it and

6   apparently I can't find it, maybe it's in here, but there is

7   nothing here that I see that says anything about being a

8   fugitive from justice.  I don't think he's got a basis for

9   that question.

10        And, in addition, the location, even if that

11   occurred, the location at which he was arrested appears

12   irrelevant.

13        MR. TAYLOR:  It's a hot bed of antigovernment

14   activity, it's a hot bed of order, the Arayan Nation has a

15   number of organizations that may relate to credibility,

16   Judge.  This man's expressed an intense, I submit, dislike

17   of this country and this government in the guise of

18   patriotism and all of these things should be weighed by the

19   jury in determining whether the ATF -- I haven't gotten to

20   him, well, he was approached by investigators in a very

21   serious fashion after I got back to Nashville, and Your

22   Honor's aware of the severity of the potential of punishment

23   in a case like this.

24        Now I didn't send an investigator out to find this

25   out, it came to me, and I believe the witness's answer

Gov't Exhibit 1, Page 48

1822

1    suggests that it's true, so apparently I did have the

2    information.  I did believe at the time, hey, the government

3    went out there and got him, that was my belief.  But I still

4    think it's relevant to go into it to bring this man's past

5    and how this built up to this particular --

6            THE COURT:  Mr. Emry?

7            THE WITNESS:  All I would like to ask, I'll answer

8    any questions you like, I have no problems relating about

9    that, I have no problems with that whatsoever, all I ask is

10   that my whereabouts, where I live now, be kept secret, and

11   that is all I ask.

12           THE COURT:  Any problem with that?

13           MR. TAYLOR:  I do, Judge.

14           THE COURT:  All right.

15           THE WITNESS:  As long as that's --

16           THE COURT:  You're overruled until you can find a

17   more probative reason than where he lives presently.

18           MR. KOSHY:  Overruled?

19           THE COURT:  Yes.  He's not going to be allowed to

20   go into where this individual currently lives since he's

21   expressed a fear for his personal safety, and unless you can

22   demonstrate that the probative value of that information

23   outweighs his prejudice and fear for his safety, which

24   appears to be genuine, given his bearing and demeanor and

25   deportment, and that's of greater moment than the probative

Gov't Exhibit 1, Page 49

UNITED STATES DISTRICT COURT

1823

1    value of what you talked about.  Otherwise, you can ask him

2    those questions.

3            MR. TAYLOR:  Judge?

4            THE COURT:  And, you know, I don't know exactly

5    where this is headed, but if we're going to get in any Fifth

6    Amendment issues, we certainly need to make sure this

7    gentleman has a lawyer.  I'm not saying there are any, but I

8    don't know where you're headed with all that.

9            MR. TAYLOR:  I believe it may very well be.  But,

10   Judge, I would say from your ruling just then I really

11   wasn't going to ask where he lives, I wanted to know when he

12   was snatched up out there in Idaho, you were brought back to

13   Williamson County jail and then October 2nd and start from

14   there because that's all when the investiation starts.

15           THE COURT:  Mr. Emry, what's your position on

16   that?

17           THE WITNESS:  I don't care about Hayden, Idaho, I

18   can discuss that, I don't live there any more.  All I'm

19   asking, and that's why I halted it quickly because of my

20   family.

21           THE COURT:  You can ask those questions.  Just

22   where he presently lives is out of bounds unless --

23           THE WITNESS:  That's all I ask.

24           THE COURT:  -- you have a more probative reason.

25           Mr. Komisar, is there any reason --

Gov't Exhibit 1, Page 50

1824

1    MR. KOMISAR:  I have a co-defendant in this case,

2  Your Honor.

3    THE COURT:  That's good enough.  Just you were

4  sitting in the wrong place at the wrong time and I was about

5  to take advantage of it.

6    All right.  Is that all I need to know?

7    MR. KOSHY:  Your Honor, if it will help the court,

8  Mr. Emry, I think on the day of grand jury, around the time

9  of the grand jury, I believe you consulted with somebody at

10  the public defender's office but has not been represented.

11  So there may be a preexisting -- some kind of relationship.

12    THE COURT:  I'm not suggesting that he needs a

13  lawyer at this time.  The two of you know more about this

14  case than I do.  I don't know where this is headed, but if

15  we get to the point where any witness needs the advice of

16  counsel, then I want to make sure it's provided.  So we'll

17  cross that bridge when we get to it.

18    Mr. Emry, you can step down, take a lunch break.

19  Come back at one o'clock and then we'll press on.

20    THE WITNESS:  Thank you.

21    THE COURT:  After lunch I'm going to hand out the

22  draft forfeiture instructions, obviously it's premature, but

23  in it I have assumed certain things that may never come to

24  pass, but I want to give them so you can look at them over

25  the weekend.  Thank you.

Gov't Exhibit 1, Page 51

1825

1        (Whereupon, a recess was had.)

2        THE COURT:  Be seated, please.  Are there any

3   issues we need to talk about before we proceed?

4        All right.  Where is our witness?  Invite him in.

5   Thank you.  Welcome back, sir.  If you could be seated.  Of

6   course, you're still under oath.

7        Let's bring the jury in to join us.

8        (Whereupon, the jury returned to the courtroom,

9        after which the following proceedings were had.)

10       THE COURT:  Welcome back from lunch.  Be seated,

11  please.

12       Mr. Taylor, you may proceed.

13  BY MR. TAYLOR:

14  Q.  Mr. Emry, you were brought back from the Northwest on a

15  fugitive from justice warrant, right?

16  A.  That's not entirely correct.

17  Q.  How did you come to be back in the Williamson County

18  jail in the fall of '02?

19  A.  Okay.  If you have got a few minutes, I'll explain it to

20  you, okay?

21       I was working for a class two manufacturer up there

22  which legally manufactures machine guns.  And, in any case,

23  it all came down to I had worked on an F-A-L rifle for an

24  individual before I ever moved to Hayden, Idaho.  I'll go

25  ahead and mention Hayden because it doesn't apply to where I

Gov't Exhibit 1, Page 52

UNITED STATES DISTRICT COURT

1826

1  live now.  In any case, he said I stole the rifle.  It was

2  damaged beyond repair.  And we had other altercations

3  besides that.  And if you want me to go into that I can.  It

4  doesn't matter, it's neither here nor there.

5          The fact of the matter is he said I stole the

6  weapon when, in fact, it was in repair.  And he abandoned

7  the property on me.  So they put a fugitive flight on me.

8  He had, I guess, connections in the local municipality, and

9  I had to take care of it, so I posted bond, which was very

10  excessive, and I got me a lawyer, and my lawyer said the

11  court date's going to be such and such time, maybe the 10th

12  of October or something like that.  So I flew back on my own

13  accord, worked for an individual for about two weeks to pay

14  for the plane ticket, in Chattanooga -- I mean in Knoxville,

15  and in the ensuing period of time is when I contacted ATF of

16  my own accord.

17  Q.  You're back to Nashville now?

18  A.  I'm back.  I'm not in Nashville yet.

19  Q.  Okay.  Well, Knoxville?

20  A.  I'm in Knoxville.

21  Q.  Let's pick up there.  You were in Knoxville in '02,

22  approximately October?

23  A.  Right.

24  Q.  All right.  And subsequent to that you were brought to

25  the Williamson County jail after that?

Gov't Exhibit 1, Page 53

UNITED STATES DISTRICT COURT

1827

1   A.  Well, there's something that happened before that.

2   Q.  What happened?

3   A.  I contacted the ATF because my conscience was bothering

4   me about what I did.  I did.  I'll go to jail if they want

5   me to go to jail for it.  The reason I confronted them about

6   these two items, the one in Kansas and the one with Ken, was

7   because of my conscience.

8   Q.  Oh, all right.  So you did that in Knoxville sometime

9   before you came back to the Williamson County jail?

10   A.  Correct.

11   Q.  Sir, on October the 2nd you were interviewed in the

12   Williamson County jail, correct?

13   A.  Yeah.  I guess.

14   Q.  After you had already told the Knoxville authorities

15   what you just said, your conscience was bothering you?

16   A.  Right.

17   Q.  Okay.  During that interview, or at least one, one

18   interview at least, you were asked if you knew either a Mr.

19   Lock or a Mr. Hedgecoth, and you said you did, correct?

20   A.  I might have said I did.  I don't remember.  I don't

21   really recall the names now.  To tell you the truth, I'm bad

22   on names.

23         MR. TAYLOR:  May I approach the witness?

24         THE COURT:  Yes.

25         THE WITNESS:  What's the first names?

Gov't Exhibit 1, Page 54

1828

1        Al, okay.  David Hedgecoth.

2   BY MR. TAYLOR:

3   Q.  Would you read that?

4   A.  Knew Al Lock and David Hedgecoth and was not aware --

5   yeah.

6   Q.  All right.

7   A.  I'm sure I did say that.

8   Q.  So you said you -- so you said you weren't aware of any

9   storage facility being rented at that time?

10  A.  I still don't know anything about a storage facility.

11  Q.  All right.  But you indicated that you thought Al Lock

12  had probably built a bomb?

13  A.  That's because I lied.

14  Q.  Did you tell me just now you had already told the

15  authorities in Knoxville that you had a guilty conscience

16  and you wanted them to know about Mr. Kimball and others?

17  A.  Well, unfortunately, there's a thing called safety

18  mechanism, most people don't want to burn themselves and I

19  knew I was cutting my throat, and I was trying to let them

20  know about the situation without burning myself more than I

21  had to do or should.  I finally come clean though later on.

22  Q.  But didn't you, did you not say, sir, that you

23  approached the Knoxville ATF, gave them information about

24  some people, I'm assuming regarding machine guns, and Mr.

25  Kimball?

1829

1  A.  Yes.  Because I was worried about the explosives in the

2  wrong hands and I was worried about the machine guns being

3  used in the wrong way.

4  Q.  You also, sir, stated Knoxville was before Williamson

5  County?

6  A.  Yes, it was.

7  Q.  Your first stay in Williamson County, sir, you said, you

8  knew nothing about any bomb, and if there was anybody who

9  made one it was Al Lock, a shady character?

10  A.  Most of what I told them has to be disregarded because I

11  was basically in the death throws of my own life it looked

12  like and I was just trying to safeguard myself and I finally

13  come to the conclusion that I'm going to have to tell the

14  full truth, the whole truth and nothing but the truth, to

15  the best of my ability, and that's what I finally did.  Let

16  the chips fall where they may.  And that's exactly what I

17  did when I came clean.

18  Q.  Can you explain the logic of trying to protect yourself

19  if you have already told it in Knoxville and then you denied

20  it later in Williamson County?

21  A.  Well, almost anybody can tell the logics of that and

22  nobody wants to go to jail and spend the rest of their life

23  in jail.  But the safety of individuals, I couldn't sleep at

24  night knowing that I hurt somebody indiscriminately.

25  Q.  Okay.  October the 7th you came back to Williamson

Gov't Exhibit 1, Page 56

1830

```
1   County, you were interviewed by the ATF?

2   A.   Yes.

3   Q.   Did the ATF come to you and tell you what kind of

4   trouble you were in, right, if you were involved in

5   explosives?

6   A.   Sure.

7   Q.   You were aware that you possibly were looking at a

8   mandatory 30-year sentence if a bomb was used in a violent

9   offense?

10  A.   Yes, sir.

11  Q.   And you knew that a bomb and a silencer was used, two

12  items, in separate events, it was a mandatory life sentence,

13  sir, did you know that?

14  A.   I didn't know anything about that.

15  Q.   You didn't know?

16  A.   I knew it was a maximum heavy sentence and you might as

17  well spend the rest of your life in jail.

18  Q.   Correct.

19        So you knew on October 7th you were possibly

20  looking at 30 years of your life in jail?

21  A.   Well, maybe I can help you out a little bit on this.

22  Q.   No, sir.  So you knew on October the 2nd that you were

23  possibly looking at 30 years in jail?

24  A.   I didn't care.

25  Q.   But you lied?
```

Gov't Exhibit 1, Page 57

1831

1    A.  I lied and finally came clean, that's when I didn't

2    care.

3    Q.  Well, let's talk about October the 4th, if you would,

4    sir.  You were back in Knoxville on that date, correct?

5    A.  Yeah.  If it was before I went to jail there because of

6    a bond, yes.

7    Q.  You went to jail why?

8    A.  Because I didn't -- I went to jail the day before I was

9    supposed to show up in court and it was a bond hearing, and

10   so I had to post bond again.

11   Q.  You were in Williamson County jail on October the 2nd

12   when you lied to the ATF, correct, according to your

13   statement?

14   A.  I lied to them.

15   Q.  According to your statement?

16   A.  I lied to them when I first came to them too.

17   Q.  So the ATF took you back to Knoxville?

18   A.  No.  I took my own self back to Knoxville.

19   Q.  All right.  Now on October the 4th you gave another

20   statement to the ATF, did you not?

21   A.  Was that while I was in jail?

22   Q.  Did you meet -- do you recall meeting with three ATF

23   agents shortly after you were in Williamson County jail up

24   in Knoxville?

25   A.  I met with them, yes, I did.  I met with three of them.

Gov't Exhibit 1, Page 58

1832

1    I think one of them came in from Nashville, yeah.

2    Q.  All right.  And do you recall telling them a story about

3    a Greg Moss?

4    A.  Yes, I do.

5    Q.  And you said Greg Moss -- I believe in that story you

6    said Al Lock made the bomb, right?

7    A.  Yeah.  And I lied.

8    Q.  All right.  So now we're down to Knoxville and you say

9    you told them the truth, in Williamson County you started

10   lying because you were afraid but you really didn't care

11   that you were looking at 30 years, right?

12   A.  At that time I cared.

13   Q.  All right.  October the 4th you say Al Lock's involved

14   and Al Lock built the bomb?  And you also say, sir, on

15   October the 4th, is it not so, that you believed that this

16   transaction took place in October or November of 2001?

17   A.  September, October of 2001, that's -- you're talking

18   what event?

19   Q.  Greg Moss made the bomb according to you on that October

20   the 4th statement, 2002, Greg Moss made the bomb sometime in

21   October or September?

22   A.  I don't remember the lies that I said.  All I'm going by

23   is the truth now.

24   Q.  Are you being paid by the ATF?

25   A.  The only thing I get paid is for a little bit of travel

Gov't Exhibit 1, Page 59

UNITED STATES DISTRICT COURT

1833

1    time and food.

2    Q.   How much have you been paid so far?

3    A.   Oh, I don't know.   Not counting how much they spent for

4    flights, probably been reimbursed $800, something like that,

5    in total.   But I have been flown all over the place for

6    other cases also.

7    Q.   So now you're a snitch for the ATF?

8         MR. KOSHY:   Objection to the characterization, it's

9    argumentative.

10        THE COURT:   Overruled.

11        THE WITNESS:   Well, I can answer that if you want.

12   Doesn't matter.

13        THE COURT:   You can answer it any way you want.

14   Any way consistent with your oath.

15        THE WITNESS:   Well, --

16   BY MR. TAYLOR:

17   Q.   Yes or no?

18   A.   I can only answer that in the description, not a yes or

19   no.

20   Q.   Let me ask you in a more general fashion.

21        Are you an undercover agent on behalf of the Bureau

22   of Alcohol, Tobacco and Firearms?

23   A.   I am on certain particular cases, yes.   But I do not

24   work for them directly on what they call a CI, civilian

25   informant.

Gov't Exhibit 1, Page 60

UNITED STATES DISTRICT COURT

1834

1  Q.  Are you paid?

2  A.  I'm not paid but for only my travel time.

3  Q.  And is it not true, sir, that you're now working for

4  your freedom?

5  A.  I would like to gain my freedom, but, you know, that

6  isn't what this case is all about.  This case is all about

7  getting drugs off the streets and somebody that's trying to

8  cause harm to others.  That's what this case is about.

9  Q.  Sir, isn't it true that the government, or, that is, the

10  ATF, told you they were interested in Ken Kimball after you

11  lied to them on October the 2nd?

12  A.  I at that time didn't know Ken Kimball was selling

13  drugs.

14  Q.  That's not what I asked, sir.

15       You lied on -- let me put it this way.  You thought

16  or you said Al Lock made the bomb, on October 2nd?

17  A.  Yes, I did.

18  Q.  That was really true, wasn't it?

19  A.  No, it wasn't.

20  Q.  You changed your story when the ATF came to you and said

21  we're interested in Ken Kimball?

22  A.  You know what, I didn't have a -- I had the greatest

23  respect for Ken.  And I lost all that respect when I found

24  out that he got busted with drugs.

25  Q.  You never saw any drugs in K and K, did you?

Gov't Exhibit 1, Page 61

UNITED STATES DISTRICT COURT

1835

1   A.   Never.  He didn't even drink.

2   Q.   All right.  Have you ever been -- let me back up.

3        In the October 2 period, how many machine guns did

4   you build illegally?

5   A.   In October 2?

6   Q.   No.  2002.

7   A.   In 2002.  I hadn't built any in that period of time.

8   Q.   Did you not say on direct examination that you had built

9   50 to 60 machine guns?

10  A.   Surely, but it was before that period of time.

11  Q.   And are you aware in addition to the penalties we talked

12  about, that is, 30 years and possibly a life sentence, that

13  you may be looking at a series of sentences of up to ten

14  years, over and over and over for each machine gun you

15  built?

16  A.   I would give my life for my country, and if it means

17  saving some innocent individual, yes, I'll take whatever

18  punishment they want to give me.

19  Q.   But now you're working for the ATF?

20  A.   I'm only going -- I know other people with machine

21  guns.  A lot --

22  Q.   Excuse me.  Sorry.

23  A.   A lot of them are GIs that come back from World War Two

24  and happened to carry a brick bat, but in the '68 amnesty

25  they didn't know there was an amnesty but I'm not going to

Gov't Exhibit 1, Page 62

UNITED STATES DISTRICT COURT

1836

1  turn them individuals in.

2  Q.  While you were working with the ATF you're still

3  conducting illegal activities with weapons, aren't you?

4  A.  No, I'm not.  I'm working under a class two manufacturer

5  and I don't want to divulge where I'm at and every single

6  weapon has got a number and I stay strictly clean on all of

7  that.

8  Q.  How about Mr. Baugh in Kansas?

9  A.  Mr. Baugh in Kansas?  I built those in 1999 and that was

10  supposed to be a cache of weapons used only in the case of

11  emergencies.  And I can't really go into the case very

12  much.  There's more to it than that.  That was an

13  unfortunate casualty that I had no other choice but to do.

14  Q.  But did you build illegal weapons in 199?

15  A.  Yes, sir.

16          MR. TAYLOR:  Judge, if I could have just a moment,

17  please.

18          THE COURT:  All right.

19  BY MR. TAYLOR:

20  Q.  Did you build an MP 40 for Mr. Baugh?

21  A.  Yes, I did.

22  Q.  That's an automatic weapon as well, isn't it?

23  A.  Yes, sir.

24  Q.  Is that one of the 50 or 60 or is that another year?

25  A.  The.  MP 40 was around the same period of time.  You

Gov't Exhibit 1, Page 63

UNITED STATES DISTRICT COURT

1837

1    know, it was within about a six-month period of time, of the

2    66 weapons that you're probably referring to that I built,

3    yes.

4    Q.   Isn't it true that the reason that you contacted the ATF

5    was because you wanted to try to protect yourself and Al

6    Lock?

7    A.   No, I really was trying to protect Al.   I was trying to

8    protect Ken when I first came to him.   That's why I lied.

9    Q.   You told the truth in Knoxville first, right?

10   A.   No.

11   Q.   According to you?

12   A.   I told them pretty much the same thing I told them when

13   he came down to see me.   I didn't say very much to them when

14   he came to see me in jail.

15   Q.   At the beginning of the examination, sir, you said when

16   you first came back from Idaho, went to Knoxville, you told

17   the ATF in Knoxville what had happened?

18   A.   But I -- I didn't tell the full truth.   I told them half

19   truths and I told them stuff that wouldn't implicate me.

20   Q.   But you didn't say that a few minutes ago, you said you

21   told them what had happened because your conscience was

22   guilty, didn't you?

23   A.   Sure, I did.

24   Q.   Twenty minutes ago you said that?

25   A.   Yes.

Gov't Exhibit 1, Page 64

1838

1  Q.  And the truth was Al Lock is who you thought built that

2  bomb?

3  A.  Sir, I built that bomb.

4  Q.  You blame it on him?

5  A.  Yes, sir, I do.

6        MR. TAYLOR:  Nothing further.  Pass the witness,

7  Your Honor.

8        THE COURT:  Mr. Szeigis?

9        MR. SZEIGIS:  No questions, Your Honor.

10        MR. RODGERS:  No questions, Your Honor.

11        THE COURT:  Mr. Koshy?

12

13              REDIRECT EXAMINATION

14  BY MR. KOSHY:

15  Q.  When you said here in court that you contacted ATF in

16  Knoxville and told them what had happened because your

17  conscience was getting you, what did you mean?

18  A.  I meant by that I wanted the explosive, the explosive

19  device that I had built off the street.  There was also

20  another individual by a -- Bill Moss that was selling

21  weapons that were -- shouldn't be in civilian hands, he was

22  offering rockets and more C-4 and automatic weapons and

23  semiautomatic weapons are one thing, but explosive devices

24  are too grand, so that was one of them.

25        And on top of that Phil Baugh is wanting to --

Gov't Exhibit 1, Page 65

1839

1    getting ready to lose his job and I was in fear he was going

2    to go on a rampage shooting, and he kept reiterating it and

3    reiterating it, I tried to get the guns away from him and he

4    wouldn't let me have them, so I left to do something about

5    it.  I didn't know what.

6    Q.  Did you try to provide the information without revealing

7    your own involvement in it?

8    A.  Yes, that's what I was trying to do.

9    Q.  All right.  And at that point why were you trying to do

10   that instead of giving ATF a full confession that you built

11   66 machine guns?

12   A.  Nobody wants to put a gun to their head and blow their

13   brains out, but that's basically the same effect.

14   Q.  And on November 5th, 2002, did you provide a handwritten

15   statement?

16   A.  Yes.

17   Q.  All right.  And at that point what did you think you

18   were doing?

19   A.  The handwritten statement that I made I finally just

20   said, Heck with it, all chips on the table, you know, I'm

21   going to get implicated in this and I might as well tell the

22   truth because -- and I did to the best of my ability.

23   Probably the only discrepancies that are there is because my

24   lack of ability to put time frames together.  But that's

25   probably the only discrepancy in it.

Gov't Exhibit 1, Page 66

1840

1  Q.  Was this written at the same time as that diagram we

2  talked about before?

3  A.  Yes, it was.

4      MR. KOSHY:  I offer up Exhibit 59 A, please.

5  BY MR. KOSHY:

6  Q.  59 W?

7  A.  That's my sloppy handwriting.

8  Q.  And how did it come to be that you provided that

9  statement and drew that diagram on that day?

10 A.  Well, finally come down to the wire, there is no -- he

11 stated something about my conscience.  And I had had time, I

12 already went back to Idaho, and I had time to think.  When I

13 come back through interrogating, talking to me, if you want

14 to call it that, and we were discussing everything, they put

15 me in a corner and said, Hey, a lot of this stuff doesn't

16 muster, finally I just came to grips with myself, just

17 decided just to be a man and take my lumps.  And I did this

18 on my own accord because of my conscience and only my

19 conscience.

20 Q.  And at that time when you put your pen to paper and

21 wrote it out in your own hand, did you know you could be

22 facing very heavy penalties?

23 A.  There was no promises of any way, shape, means, they

24 said you're not under arrest, but, you know, but probably

25 see some time.

Gov't Exhibit 1, Page 67

1841

1   Q.  Did you have a lawyer at that time?

2   A.  No.  And I don't want a lawyer now.

3   Q.  Now earlier just before lunch you asked for a break when

4   questions were asked about a particular location.  Do you

5   recall that?

6   A.  Yes, I do.

7   Q.  And what was your concern right then?

8   A.  Well, it was that I had my mother-in-law get murdered.

9   Q.  And you didn't want your current location --

10   A.  My ex-family, which I love dearly, and unfortunately

11   through my wreck I changed stuff, but they're scared, they

12   are on the run, they're hiding.

13   Q.  Now I think Mr. Taylor asked you about that statement,

14   and the thing he showed you, that wasn't in your

15   handwriting, was it?

16   A.  No.

17   Q.  All right.

18   A.  I can't even read it.

19   Q.  All right.  Were you interviewed that day by another

20   Assistant United States Attorney other than me?

21   A.  Yes.

22   Q.  Okay.  Was that the day before the grand jury

23   proceedings?

24   A.  I believe it was, yes.

25         MR. KOSHY:  May I approach?

Gov't Exhibit 1, Page 68

1842

1    THE COURT:  Yes.

2    BY MR. KOSHY:

3    Q.  Let me show you a grand jury transcript In Re Federal

4    Grand Jury Proceedings Panel Two, The Testimony of Michael

5    Emry, Witness, April 14th, 2003; appearance for the

6    government, Mr. Hal McDonough.

7    A.  Okay.

8    Q.  All right.  April 24th, 2003, is that when you testified

9    in front of the grand jury?

10   A.  Yes.  Yes, sir.

11   Q.  And was it the night before that that you took down

12   those notes about the time frames that we have heard about

13   already?

14   A.  Yes.  Yes.

15   Q.  How long before that grand jury appearance was your

16   mother killed?

17   A.  About a month.

18   Q.  How was she killed?

19        MR. TAYLOR:  Object to the relevance, Your Honor.

20        MR. KOSHY:  Goes to why he --

21        THE COURT:  Goes to credibility.  Go ahead.

22        THE WITNESS:  I met with a local sheriff's

23   department.  The way I found out about it was an agent in

24   Spokane called me and informed me, and at this time I had

25   been in hiding because -- well, anyways, so I meet with the

Gov't Exhibit 1, Page 69

1843

1    -- at the same period of time I meet with the sheriff's

2    department down there and they need to try to find some

3    answers.  My ex-wife is frantic, she's hiding, hiding

4    somewhere else.  Somebody came in to the back of her double

5    wide mobile home, and this is a rural area that there is no

6    crime, you know, way out of Tennessee, you know, and they

7    came in, almost like they tortured her, cut her up and then

8    covered the evidence, they burned her body.  And they took

9    an indigenous weapon from the scene to use to kill her

10   with.  And I might not be the brightest person in the world,

11   but I'm smart enough to know --

12   BY MR. KOSHY:

13   Q.  Don't speculate who did it.

14   A.  Okay.  I'm sorry.  Anyways, it's very --

15   Q.  I understand.

16   A.  I wouldn't --

17          THE COURT:  Let's go on to another question.

18   BY MR. KOSHY:

19   Q.  And at the time, before you were interviewed and went

20   into the grand jury, had you been thinking about the

21   particular time frames that you built these devices or were

22   you thinking about something else?

23   A.  I was really upset about this, about my mother-in-law.

24   Q.  And were you worried about your safety and that of your

25   family because of things that had happened?

Gov't Exhibit 1, Page 70

UNITED STATES DISTRICT COURT

1844

1    A.   I was more worried about my family's safety than myself.

2              THE COURT:   All right, Mr. Koshy we have covered

3    this.   Any other subjects you want to ask about?

4              MR. KOSHY:   Yes, Your Honor.

5    BY MR. KOSHY:

6    Q.   At the time that you -- well, you talked about the

7    trailer.

8    A.   Yes.

9    Q.   Were you making payments on the trailer?

10             MR. TAYLOR:   Object to the leading and the

11   relevance.

12             THE COURT:   Which trailer are we talking about?

13             MR. KOSHY:   The trailer that he lived in at K and

14   K.   It's relevant because it's --

15             THE COURT:   It's relevant.   Go ahead.

16             THE WITNESS:   Oh, yes, I was making payments on it

17   at the time.

18   BY MR. KOSHY:

19   Q.   Let me have handed to you Exhibit 56 G and take a look

20   at this back page.

21   A.   Nikon trailer, $3800.

22   Q.   Is that the amount that was owed to Mr. Kimball --

23   A.   Yes, it was.

24   Q.   -- for that trailer?

25             What's the date of the first payment on that

Gov't Exhibit 1, Page 71

UNITED STATES DISTRICT COURT

1845

1    trailer?

2    A.   Date of the first payment was 6-15.

3    Q.   What year would that have been, sir?

4    A.   That would have been of 2001, I believe.  Yes, 2001.

5    Q.   All right.  And how much were you paying on the trailer?

6    A.   A hundred dollars.  I was trying to pay that every week,

7    if not quicker.

8    Q.   And how long did the payments go on?

9    A.   They went on until 10-23 of that year.

10   Q.   Does that help you with time frames?

11   A.   It helps a little bit, yeah.

12   Q.   Can you pass that back, please?

13        We have heard about the 66 machine guns.

14   A.   Yes, sir.

15   Q.   What's your understanding of how the government came to

16   know about the 66 machine guns you built, the silencer you

17   built and the bomb you built?

18   A.   I told them.

19        MR. KOSHY:  Nothing further.

20        THE COURT:  Anything else?

21

22

23

24

25

1846

1    RECROSS-EXAMINATION

2    BY MR. TAYLOR:

3    Q.   Now you met with the ATF on October the 2nd, you also

4    talked about the machine guns and on October 4th you talked

5    about the 66 machine guns, right?

6    A.   Yes.   Everything about that was true.

7    Q.   You didn't have a lawyer?

8    A.   No.

9    Q.   And were you made aware that you just made a confession?

10   A.   Yes, I was.

11   Q.   And you knew then that you're in serious, serious

12   trouble in terms of potential prison time?

13   A.   Well, at that -- can I iterate and tell you?

14   Q.   Yes, sir.

15        Did you or did you not, yes or no?

16   A.   I was trying to cover myself, but yes.

17   Q.   You said that you decided to come clean, that you had

18   been cornered and you wanted to take your lumps, sir?

19   A.   Yes.

20   Q.   What lumps have you taken as a result of your actions?

21   A.   I have lost a family member, and my family's in fear for

22   their lives and I haven't been able to hold a job for fear

23   of anybody finding out where I'm at.

24   Q.   But you are working for the ATF, correct?   You have a

25   job with them?

Gov't Exhibit 1, Page 73

1847

1   A.  All I'm trying is helping provide information for them

2   but, yes, I guess I am, but I'm not doing it for pay.

3   Q.  Did you not say you received expense money?

4           THE COURT:  We have been over that.  That wasn't a

5   part of the redirect.

6           MR. TAYLOR:  Can I have just a moment, Your Honor?

7           THE COURT:  Yes.

8   BY MR. TAYLOR:

9   Q.  Sir, you're not indicating that Mr. Kimball had anything

10  to do with the death of your mother, are you?

11  A.  I don't know.

12  Q.  You're not -- are you actually saying that Mr. Kimball

13  had something to do with your mother's death?

14  A.  Sir, I would put myself out as a fish on a stick if I

15  could lure the person in that did it.

16  Q.  What was the date your mother died?

17  A.  It was in -- I think it was April.  Something like that.

18  Q.  April of what year?

19  A.  Of 2003.

20  Q.  2003?

21  A.  Uh-huh.  Don't quote me on that time period.  It was

22  right in that area.

23  Q.  Do you have any information whatsoever that Mr. Kimball

24  might be involved in that?

25  A.  I really don't know who could have done it.

1848

1   Q.  It was not in this state?  She didn't live in this

2   state?

3   A.  But Mr. Kimball could have -- could have been a part of

4   a bigger picture when it comes to drugs.

5   Q.  Well, you're cooperating against individuals who

6   manufacture firearms all across the United States, aren't

7   you?

8   A.  It's only because I've worked for individuals that --

9   yeah, I guess so.  Yeah.

10  Q.  That's dangerous isn't it?  Snitching --

11  A.  Well, --

12  Q.  -- against gun manufacturers?

13  A.  I would say it probably is, yes.

14  Q.  Did it appear to be a robbery?  And I don't mean to be

15  --

16  A.  That's all right.  No problem.

17  Q.  Did it appear to be crude?  Excuse me, did it appear to

18  be a robbery?

19  A.  There was nothing they could find that was taken.  It

20  was no scene of a robbery at all.

21  Q.  Okay.  Now I believe you said that Mr. Koshy asked you

22  the date it happened sometime close to the time that you

23  gave these statements, did that somehow confuse you so you

24  thought that 9-11 was some other date that the bomb --

25  A.  No, fact of the matter is I get time frames mixed up,

1849

1   that's all.  The fact of the matter is I built the bomb.

2   Q.  9-11?  And it may be that it was provided after 9-11,

3   correct?

4   A.  I really don't think it has from going through my

5   paces.  I think it was before.

6   Q.  I'm sorry?

7          THE COURT:  He said paces.

8          THE WITNESS:  My paces, trying to backtrack the

9   time frames like when I was paying for the trailer, trying

10  to go back through those time periods and using number

11  references in my mind.  All I know is after 9-11 my mind

12  started changing a little bit, that we need to work

13  together, not against each other.

14         MR. TAYLOR:  That's all I have, Your Honor.

15         THE COURT:  Thank you, sir.  You can step down.

16         Mr. Koshy, who's your next witness?

17         MR. KOSHY:  Frank Stenberg.

18

19              FRANK EUGENE STENBERG,

20     having been first duly sworn, testified as follows:

21              DIRECT EXAMINATION

22  BY MR. KOSHY:

23  Q.  Good afternoon, sir.  You're Frank Stenberg?

24  A.  Yes, sir.

25  Q.  And are you originally from the Nashville area?

Gov't Exhibit 1, Page 76